UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

*Electronically Filed*

| | |
|---|---|
| DAVID WILSON, as Administrator of the Estate of Lisa Noble, Deceased, Plaintiff | |
| | C.A. No.: 6:17-00157-CHB-HAI |
| VS. | PLAINTIFF'S RESPONSE TO DEFENDANTS' FRCP 37(C) MOTION TO PROHIBIT THE TESTIMONY OF SELENA MOORE AND TAMMY SAYLOR AND/OR USE OF STATEMENTS AND VIDEO BY SELENA MOORE AND/OR TAMMY SAYLOR |
| BEACON TRANSPORT, LLC and TERRAN COOPER, Defendants | |

Comes the Plaintiff, by counsel, in response to Defendants' motion at Docket No. 99:

**Introduction**

Plaintiff's timing of its Rule 26(A) supplementation making full disclosure of its work product of the investigator interviews of eye witnesses Ms. Moore and Ms. Saylor was substantially justified. Furthermore, the timing caused no harm to the defense. On the contrary, the defense's own medical expert claimed the Saylor interview supported his conclusions. The Motion at bar should be denied as a result. Alternatively, the request that the Court deny fact witness accounts long known to the Defendants to the jury deciding this case would be a grave

injustice to Ms. Noble and her Estate. It would be an insult to justice on whole. In the alternative, should the Court find that a sanction is appropriate over this objection of Plaintiff, an instruction to the jury that it may infer bias as a result of the witnesses submitting to recorded investigator interviews and explaining the timing of the Supplementation of those to the defense would be a complete remedy.

The suppression of eye witness accounts of Ms. Noble's condition after this crash and before her death is the true objective to the Motion at Bar and at Docket No. 93. Taking those depositions after experts were disclosed under a claim of a quest to see if these witnesses were somehow "biased" because they gave statements to an investigator consistent with their KSP statements may well have been a ruse since when given the opportunity of an Agreed Order permitting it for consideration by the Court, the defense declined.[1] These witnesses were long known to the defense as to what they witnessed. Refusing to take their depositions was a strategic move during fact discovery on the part of the defense so as to avoid preserving testimony that it knew supported Ms. Noble's claim for damages for her excruciating pain and unimaginable suffering that she experienced in the minutes before her death.

I.  **The Motion Concerns Eye Witness Accounts Known by the Defense from Good Samaritans Who Witnessed Ms. Noble's Suffering and Were Offended by Defendant Cooper's Disrespectful Conduct at the Scene of the Crash – All of Which Was Confirmed in their KSP Witness Statements Held by the Defense During Fact Discovery.**

---

[1] The defense represented to the Court as recently as November 6th in the teleconference proceeding this briefing that it simply wants the Saylor and Moore depositions to explore bias before trial, in addition to what was witnessed at the crash. It represented that the defense's Summary Motion practice would not be affected by their taking during this discussion. Counsel Judd advised of something to the effect that *we as lawyers would otherwise work this out if we could* – and in response Plaintiff's counsel expressed a willingness to compromise and get the depositions done with proffer of an Agreed Order for the Court to consider. The defense did not reach out for any such agreement. In follow-up to the conversation with the Court, Plaintiff's counsel contacted Mr. Judd November 20th, 2018. Counsel spoke and then sent the attached email at Exhibit 1 offering to provide the deposition relief he had requested completely for the Court's consideration by Agreed Order resulted. No response was received.

Ms. Saylor and Ms. Moore were personally witnessed and photographed at the crash scene by Defendant Cooper as they responded and comforted Ms. Noble.  Defendant Cooper testified that he *personally witnessed* Ms. Noble moving around in her car after the crash.  He testified that he saw folks praying with Ms. Noble – though he did claim he could not hear what was said. There was no surprise to anyone involved in this case pre-litigation or through fact discovery as to who the witnesses at the scene were that tried to comfort Ms. Noble as she was dying. Still, the defense waited to take action before the Court concerning these witnesses through the close of fact and into expert discovery.  Ultimately this Motion resulted.  Any claim of surprise as to what Ms. Saylor and Ms. Moore witnessed and their resulting feelings or bias towards him rings hollow given the record that includes their KSP statements and Mr. Cooper's sworn testimony of:

> Q: What did you do to help her?
>
> A: Basically I looked at her. When I was on the phone with 911, 911 asked me, "Is she alive?" I said, "Yes, she is." "Is she moving?" I said, "Yes, she is." I mean, basically I'm on the phone. Okay? I saw everything that's in my sight. (Terran Cooper Deposition, 2/19/2018, p. 109, ll 8-16, attached as <u>Exhibit 2</u> hereto).
>
> Q: And what was Lisa doing in the car then?
>
> A: Who's Lisa?
>
> Q: Ms. Noble, the lady that died.
>
> A: Basically, she was just moving around. (Terran Cooper Deposition, 2/19/2018, p. 110-111, ll 21 – 1, attached as <u>Exhibit 2</u>).
>
> Q: Did you see the people talking to her and praying with her?
>
> A: Basically that was after the fact.

3

> Q: Did you see that?
>
> A: Yes, I did.  (Terran Cooper Deposition, 2/19/2018, pp. 104-105, ll 25 – 4, attached as <u>Exhibit 2</u>).

Below is a photograph that Mr. Cooper took of these very witnesses at the scene once First Responders had arrived and before Ms. Noble was extricated from her vehicle. There can be no claim of harm of any kind by the defense concerning any bias of these witnesses. This is especially true when one considers that the defense claims that these witnesses avoided his investigators and would not talk to them after the crash and throughout fact discovery as addressed in his briefing of this Motion and that within Docket No. 93.  <u>The defense knew of the disdain these folks had for Mr. Cooper from their KSP witness statements</u>.  Any bias they have



4

is evident within those official statements that the defense possessed during fact discovery when it elected against pursuing their depositions. The defense simply chose against deposing these witnesses so as not to preserve adverse testimony.  This scene photograph taken by Defendant Cooper comports with the KSP witness statements given by Ms. Moore and Ms. Saylor as to Mr. Cooper's behavior at the scene.[2] Ms. Saylor is the woman with short cropped hair in the blue hooded sweatshirt; Ms. Moore is the woman with reddish hair facing the camera.  A third eye witness, Michael Anderson, is in the rear of the picture walking around and has a beard.

Finally, given Mr. Cooper's observations above, it is clear that he witnessed Ms. Noble conscious and moving, and that he watched and even photographed as she was attended to initially by Good Samaritans Saylor and Moore, and ultimately first responders.  This is further directly evidenced by <u>Exhibit 3</u>, an email sent on the date of this crash stating that Mr. Cooper told his employer that Ms. Noble was taken from the scene with what appeared to him to be serious but non-life-threatening injuries. <u>Exhibit 3</u>  Email from Beacon's Randy Cummins of January 5, 2018.

### II. The Known "Significance" of these Witnesses and Any Bias They Had During Fact Discovery Is Confirmed by the Record Contrary to the Defense's Claims.

The claim now made for the second time in Motion practice by Defendants that "Defendants were not aware of the significance of Saylor and Moore until June 19, 2018" remains untrue. *Docket No. 99.  P. 15* Likewise, the claim that the defense was harmed somehow

---

[2] The existence of video and materials will be in issue concerning the spoliation of evidence by Defendant Cooper, whose camera phone had been claimed preserved for download by his counsel as a result of the request of the Plaintiff, but was in fact "wiped clean" with all information from the date of the crash deleted just before the Plaintiff was permitted to download it. The video believed taken by Ms. Moore and documented in her KSP statement was never produced.

by the timing of the complete surrender of investigator interviews and investigator notes with the Plaintiff's June 19, 2018 Rule 26 supplementation (Noticed at Docket No. 71) is untrue.  These witnesses were initially sought for deposition by counsel Judd's office on October 27, 2017 when Kelley Gainer noted in an email to the Plaintiff that Mr. Judd "was looking to take the depositions of the three witnesses, the State Police responding officers, and the EMS responding medics". <u>Exhibit 4</u>, Gainer email of October 27, 2018, bottom of page 1. Ms. Gainer is referencing Ms. Moore, Ms. Salyer, and Mr. Michael Anderson who are the three witnesses disclosed on the police report, who gave written witness statements to the KSP on the day of the crash, and who were photographed by Defendant Cooper that same day while Ms. Noble was in her vehicle. The KSP investigative file and the statements within it was not obtained until later in the case during fact discovery over the Winter of 2018.  For seemingly obvious reasons given the content of the statements addressed below, it was after that point that it appears that the taking of these depositions was no longer a priority for the defense.

     The statements given by Ms. Moore and Ms. Saylor to KSP show both their traumatic experience comforting Ms. Noble as she awaited responders, and their disdain for Mr. Cooper's conduct during Ms. Noble's final minutes of consciousness and life.  The claim made by the Defendants on page 2 of the previously filed  Motion at Docket No. 93 and on the pending Motion at page 1 asserting that Selena Moore's witness statement did not allude "in any way to supporting a punitive damage claim and or pain and suffering claim" is also untrue. The statement shows that there was no harm to the defense by the manner of her investigator interview disclosures by Plaintiff.   Ms. Moore's witness statement was taken in writing by the Kentucky State Police on the date of the crash as part of its official investigation.[3] In her KSP

---

[3] Ms. Moore's statement to KSP is in the record at Docket No. 95-3 and also at Docket No. 99-2.

witness statement, Ms. Moore wrote in pertinent part: "I was driving on I-75 towards Corbin ahead I seen and semi-trailer stopped in the middle of the road, when a car came driving about 60-65 mph toward that semi. The driver did not brake until right on the semi, she whipped the wheel when she did she clipped the truck. My girlfriend and I immediately pulled to the shoulder an ran toward the wrecked car. Upon arriving to the scene we managed to get the door open. My g/f Tammy Saylor covered her with a blanked and took her pulse, she was breathing, but sort of a gurgle. <u>Tammy talked to her until paramedics arrived</u>. The truck driver had no flashers on, no triangles. He put the equipment out after the collision. He began videoing the accident and arguing with paramedics. Being very disrespectful, especially in these circumstances." *Emphasis Added*. The defense was acutely aware that Ms. Moore witnessed Tammy Saylor talking to Ms. Noble until the paramedics arrived, covering her with a blanket, taking her pulse, and that Mr. Cooper was witnessed arguing with paramedics and behaving disrespectfully at the scene.

     Likewise untrue is a claim that Tammy Saylor's KSP witness statement did not allude "in any way to supporting a punitive damage claim and or pain and suffering claim.". *Docket No. 93 at page 2, Docket No. 99 P. 1*. That witness statement was also taken in writing by the Kentucky State Police on the date of the crash as part of the official investigation.[4] In her witness statement, Ms. Saylor stated in pertinent part: "I was travelling on I-75 towards Corbin when we came up on a stalled semi truck stopped in the left lane with no flashers or triangles. A white car passed us going around 60 mph. The car didn't break until right upon the semi. The car did a small steer the the right clipped the semi. We pulled over I ran to the victim took her pulse and she was breathing. I covered her up. The truck driver then turned on his flashers and put out

---

[4] Ms. Saylor's KSP statement is in the record at *Docket No. 95 -4* and *Docket No. 99-2*.

7

triangles. 911 was called EMS and officers arrived within minutes. The truck driver during this time was videoing and saying things to EMS". This witness was known to the defense as 1) attending to Ms. Noble, 2) covering her up due to the cold, 3) personally took Ms. Noble's pulse and 4) confirmed that Ms. Noble was bleeding. She also witnessed Mr. Cooper's disrespectful conduct at the scene of the crash, to which she referred in stating that he was "videoing and saying things to EMS."

The defense has also attempted to prove its feigned surprise as to the knowledge it had concerning these witness by again repeating a misleading statement that the KSP statements of Ms. Saylor and Ms. Moore are statements that "dealt with the speed and position of the vehicles in issue". *Docket No. 99 at page 13.* That claim again materially omits reference to the content of those statements that is at the very heart of this dispute. That omitted content from these two KSP witness statements details the suffering that Ms. Noble endured as she struggled for her life. That omitted content also documents the condemnable conduct of Defendant Cooper at the scene upon which a claim for punitive damages and the tort of Outrage is partly based as specifically pled in the Complaint: he was witnessed videotaping during this rescue and disrespectfully arguing with Ms. Noble's paramedics as she suffered towards her impending death…

As to additional actual knowledge of Ms. Saylor and Ms. Moore's roles in this case, the Defendants identified Ms. Saylor and Ms. Moore on their FRCP 26 disclosures as having "knowledge concerning the accident" at *Docket No. 19-1* filed of record on August 24, 2017 – roughly 8 months prior to the close of fact discovery. Plaintiff disclosed them as well in the Rule 26 disclosures, and also in Interrogatory Answers, pertinent portions of which are attached at *Docket No. 95 Exhibit E – Plaintiff's Int Answers* filed on September 25, 2017 that: Ms. Noble suffered physical pain, fright and mental/emotional suffering before her death from injuries

8

sustained in the crash. *See* <u>Response to Int. No. 2</u>. Tammy Saylor and Selena Moore, who are listed on the collision report saw the collision and they were with Lisa after the collision occurred. They would have discoverable facts regarding this matter. *See* <u>Response to Int. 18</u>. Plaintiff explained that Lisa Noble was not killed upon impact. She was still breathing after the collision when persons who stopped tried to help her and prayed with her, she responded when she was urged to breathe. She later died at the hospital. <u>See Response to Int. No. 26</u>. It is clear from the record who was talking with her – Ms. Saylor, and it was Ms. Saylor who was monitoring her pulse and breathing.

Plaintiff also made very specific pleadings of fact in the Complaint. *Docket No. 1* Plaintiff specifically pled allegations of fact therein at paragraphs 4.52 through 4.55 that: Ms. Noble could hear subsequent to the collision. Ms. Noble could see subsequent to the collision. Ms. Noble responded to direction to breathe subsequent to the collision. Ms. Noble suffered conscious pain and suffering subsequent to the collision. The Complaint specifically further pled at paragraphs 4.56 through 4.62 that: following the collision, Mr. Cooper exited his vehicle holding a phone. That when Mr. Cooper exited his vehicle, he instructed persons attempting to assist Ms. Noble to get away from her and her vehicle. When Mr. Cooper instructed persons attempting to assist Ms. Noble to get away from her vehicle, Ms. Noble was alive within it. When Mr. Cooper instructed persons attempting to assist Ms. Noble to get away from her vehicle, at least one of those persons was praying with Ms. Noble while awaiting the arrival of an ambulance. When Mr. Cooper exited his vehicle after the crash, he claimed that Ms. Noble caused the collision to persons attempting to assist Ms. Noble.

The actual Complaint put Defendant on notice at the outset of this case of the issues of conscious pain and suffering and the claims against Mr. Cooper for his conduct while Ms.

9

Noble's attempted rescuers prayed with and comforted her. The claim that Plaintiff attempted to conceal parts of its theory on damages is disproven by the record and all of this information, known to the defense throughout this litigation, shows there was no harm supplying a basis for the Motion for Sanctions at bar and the disingenuity of the present Motion.

**III.   The Motion at Bar Seeks to Suppress Evidence from the Jury When Nothing Was Done to Attempt to Compel the Depositions of Ms. Moore and Ms. Saylor Despite their Purported Service of Subpoena and No Deposition Was Taken of the Investigator Who Conducting the Interviews During Expert Discovery.**

The number of late depositions that the defense noticed to take was much greater than simply those of Ms. Saylor and Ms. Moore. It noticed six (6) depositions after the close of fact discovery. The record is clear that the Plaintiff has cooperated with defense counsel to complete the discovery it noticed while desiring to keep the trial date docketed. The defense's late fact discovery assented to by Plaintiff was not limited to just an attempt to depose Ms. Saylor and Ms. Moore. Rather, the defense noticed the late taking of proof from:

1. Ms. Saylor; Depo. Notice at *Docket No. 55*, Subpoena at *Docket No. 64*.
2. Ms. Moore; Depo. Notice at *Docket No. 56*, Subpoena at *Docket No. 65*.
3. Eye Witness Michael Anderson; Depo. Notice at *Docket No. 57*, Subpoena at *Docket No. 63*.
4. Investigating KSP Officer Toby Curry; Depo. Notice at *Docket No. 58*, Subpoena at *Docket No. 61*.
5. Responding EMT Steven Dykes; Depo Notice at *Docket No. 59*, Subpoena at *Docket No. 62*.
6. Emergency Treating Physician Dr. David Waymon Douglas Depo. Notice at *Docket No. 60*, Subpoena not returned.

The Defendants took the depositions of Michael Anderson, Toby Curry and Steven Dykes on June 26th, 2018 as noticed.  However, Dr. Douglas was never served – and he was known as Ms. Noble's treating physician pre-litigation as addressed in Plaintiff's briefing at *Docket No. 95*. Ms. Moore and Ms. Saylor were purportedly served, but did not appear.  Rather

than attempt to compel their testimony in June since they had been purportedly served, the defense did nothing. This is despite that these witnesses were under subpoena.     The defense also did nothing to compel the attendance of Ms. Moore or Ms. Saylor in June, July or August.[5]

      The defense also did not seek to depose the staff investigator of Plaintiff's accident reconstructionist who took the witness statements during expert discovery to flush out any influence or bias... Her identity was disclosed to the defense within the materials in issue. *Docket No. 99-3, p. 1*   If one is concerned that something was askew with these interviews, and can depose the investigator who took or "created" them, logic dictates that one would depose the interviewed to explore that concern if it was of any materiality. With no simple request to depose the investigator, the true purpose of this process continues to show that taking the depositions of these two eye witnesses was not a true objective.  Rather, defendants were able to send their experts what counsel chose of the witness interviews and investigator notes provided for use in their reports. This case has now proceeded through extensive and expensive expert depositions. As a result of its own delay, the Defendants are now essentially attempting to move *In Limine* against eye witnesses under the guise of a FRCP 37 dispute.  The interest of justice surely cannot be served via the drastic sanction sought given the information known to the defense about these witnesses.

---

[5] The present Motion may prove the adage that *no good deed goes unpunished*. Admittedly conflicted over the prospect of submitting to the extensive fact discovery noticed by the defense after Plaintiff's expert witnesses were disclosed and before defense disclosures were due, the Plaintiff assented to the defense's attempted to take the six depositions it wanted. Plaintiff did so without consuming the resources of the Court and causing a dispute.  These were all known fact witnesses.

### IV. All Materials Were Completely Disclosed; The Date of the Disclosures Was Justified, and No Harm Resulted.

It was and remains Plaintiff's position that its investigator's recorded interviews with these individuals were work product. Investigators who took them were engaged by Plaintiff's counsel and directed to interview Ms. Saylor and Ms. Moore and recorded interviews were made. These were not written statements of witnesses, but rather recorded conversations with agents of counsel investigating this matter in anticipation of litigation, and actually while in litigation. The questions presented were asked in investigation of and hopeful support of the causes of action ultimately pled in the Complaint. They were asked by investigators working for the company (Stidham Reconstruction and Investigations) that was performing an accident reconstruction in this matter at that time as a consultant, prior to disclosure as a testifying expert over a year later.

This Court is well versed in the law of the case with regard to work product and disclosures: work product "protects 'the files and the mental impressions of an attorney ... reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways [,]' prepared in anticipation of litigation." A. Michael's Piano, Inc. v. FTC, 18 F.3d 138, 146 (2d Cir.) (quoting Hickman v. Taylor, 329 U.S. 495, 510–11, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947)), cert. denied, *428 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 490 (1994). There are three requirements for shielding documents from discovery under the work-product doctrine. "Rule 26(b)(3) protects (1) 'documents and tangible things'; (2) 'prepared in anticipation of litigation or for trial'; (3) 'by or for another party or its representative.' " In re Professionals Direct Ins. Co., 578 F.3d 432, 438 (6th Cir. 2009) (internal citations omitted). "Prepared in anticipation of litigation" is determined by asking two questions: "(1) whether that document was prepared "because of" a party's

subjective anticipation of litigation, as contrasted with ordinary business purpose; and (2) whether that subjective anticipation was objectively reasonable." Id. at 439 (quoting United States v. Roxworthy, 457 F.3d 590, 594 (6th Cir. 2006)).

The witness statements in issue were interviews conducted by an investigator on behalf of Plaintiff and were clearly work produce protected from discovery by FRCP26(b). Prior to their use by the experts ultimately disclosed by the defense, they would not have been discoverable by the defense absent a showing that it had a substantial need for the materials to prepare its case and that it could not, without undue hardship, obtain their substantial equivalent by other means. Plaintiff's investigator disclosed to the witnesses that she was working for counsel and that her office was asked that she interview the witnesses to the accident. *Docket 99-3 Moore & Taylor Statement Stidham, pdf. P. 13 ll 12-15.* The Plaintiff was clearly anticipating litigation since counsel was pursuing the claims of the Estate of Ms. Noble for her wrongful death and this litigation resulted. The work product rule affords special protections for work-product that reveals an attorney's mental impressions and opinions. Other work-product materials nonetheless may be ordered produced upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship." In re Perrigo Co., 128 F.3d at 437.

There was no substantial need to obtain the recorded witness interviews of Plaintiff's investigators given the witness statements from KSP possessed by the defense and Defendant's own observations at the scene of these witnesses interacting with Ms. Noble. There furthermore was no inability to obtain equivalent information of statements from these witnesses; the defense knew of these witnesses and did nothing to depose them until after fact discovery closed. It had

13

the full power of the Federal Government essentially to compel their testimony. There cannot exist undue hardship without making a material effort to take the depositions of these witnesses.

Moving from the issue of work product, all of the materials in issue were disclosed *completely and fully* to the defense with no resultant harm. Plaintiff made full disclosure of investigative interview materials and notes relating to Ms. Saylor and Ms. Moore on June 19, 2018. Plaintiff's concede that witness statements in issue existed during discovery (though the affidavit at Docket No. 95-5 was provided by Ms. Saylor on October 18, 2018). Plaintiff made objection to the production of the investigator interviews and notes on the grounds of Work Product immunity from production. Plaintiff also concedes that no log was provided of the materials that were ultimately produced. That said, attorney work product privilege was asserted in the same manner by the defense without any privilege log when Plaintiff requested like statements from the defense.[6] Neither party provided privilege logs nor requested a log to be provided by the other despite the objections asserted by both. This is something it is hoped the Court will consider when assessing the equities involved in this dispute.

The defense's allegations that the interviews were fabricated, or otherwise unfairly influenced by the Plaintiff's investigators or counsel are unfounded, completely unsupported and are patently untrue. The defense has the actual recordings and video. That said, to the extent that giving an investigator a recorded statement can be claimed bias, having the statement mitigates all purported harm. The statements are available for use in cross examination at trial and counsel can argue that these Good Samaritans' cooperation in providing statements shows some sort of bias on their part.

---

[6] Beacon's Interrogatory response no. 7 and Document request K and particularly M, N and O seeking statements, interviews of witnesses and incident reports at *Docket No. 27*. The objections were filed without privilege log and state: "This interrogatory violates the attorney client privilege and//or work product doctrine to the extent that it requests statements obtained by counsel. Other than counsel's work product, none are known."

14

### V.  Defense Medical Expert Dr. Donato Borrillo Claims Ms. Saylor's Interview Supported his Opinion.

Ms. Saylor's recorded interview *actually bolstered* the defense's case, according to its medical expert, Dr. Donato Borrillo.  Plaintiff's supplemented Rule 26(A) disclosures were filed *fifty-seven (57) days* prior to the date that the defense expert reports were due in this case. Plaintiff voluntarily supplemented its disclosures with the statements of these witnesses so as to give the materials relied upon by the experts to the defense *in toto* for consideration before defense disclosures were due. The defense did that, and has used those materials to support its case.  Defense medical expert, Dr. Donato Borrillo, specifically commented on the interviews in issue of Ms. Moore and Ms. Saylor.  Dr. Borrillo testified not only that he had reviewed them, but that he found that Ms. Tammy Saylor's statement supported his conclusions in the case. (Dr. Donato Borrillo Deposition, 10/16/18, p. 25, ll 8-20, attached as Exhibit 5).  He further testified that it could have been possible for Ms. Noble to clutch Ms. Saylor's hand while Ms. Saylor prayed with her, and that he could not completely discount that Ms. Noble was still conscious for a point in time after the collision until she lapsed into unconsciousness. (Dr. Donato Borrillo Deposition, 10/16/18, p. 32, ll 2-10, attached as Exhibit 5).

Lastly with respect to any alleged harm to the defense, and going towards the actual probative value of the specific content of the materials in issue, Dr. Borrillo conceded that Lisa Noble was conscious for a short period of time during and after the accident and that she suffered pain as a result of the impacts to her body:

> Q:   And how quickly upon the instance of damage to the vehicle would she have lost consciousness?
>
> A:   The vehicle itself had significant damage to the rooftop, the - -the upper area of the - -auto, which is where Ms. Noble's head-neck area would be. And so, almost immediate- -as soon as the crash occurred, you had almost

        immediate head injuries. So where- - where in- -in my mind, literally seconds, one second or two seconds, how- -however long it takes for that crash, and the top of the car, and the head to be hit. And then from that point on, you had a rather immediate head injury with subsequent heart rate and breathing that resulted - -

Q:     So - -

A:     - -that were found by paramedics.

Q:     - - and I know that this is small, but in that one to two seconds between the initial impact and her body's impact, she would have been able to see and perceive and feel what was going on in the vehicle, correct?

A:     Yes, sir. I don't recall seeing an airbag, if her vision would have been obstructed. But yes, for those brief seconds, yes.

Q:     And in that one to two seconds, when her head would have initially been struck, she would have been able to feel that blow?

A:     Yes, sir.

Q:     And that would have been painful for her?

A:     Yes, that would have been - - that would have been painful, uncomfortable, yes. (Emphasis added). (Dr. Donato Borrillo Deposition, 10/16/2018, pp 37-38, ll 9-25, 1-13, attached as Exhibit 5).

**VI.**     **Should the Court find a Sanction in Order, an Instruction to the Jury Would Cure the Matter Under Rule 37(c)(1)(C).**

The claim of prejudice or harm resulting from the disclosures of Plaintiff are a ruse. Any neglect by the defense to depose these individuals was not excusable – and likely was not neglect but rather was strategy to create the current situation. The defense knew these witnesses opposed it. It claims they would not talk to defense investigations. That said, it did not try to compel these depositions. Clearly no showing could have been made that could have compelled production of these statements under Rule 26(b)(3). Plaintiff's retaining this work product holding the statements until experts were disclosed who had reviewed and relied upon them was

substantially justified, and no sanction should result under Rule 37(c). That said, though there was a short delay in early June between filing Plaintiffs 300+ pages of expert disclosures and materials and the Rule 26 supplementation made, no actual harm resulted. In fact, the defense's case was bolstered according to Dr. Donato Borrillo, the defense medical expert. No sanctions are due since no harm accrued and furthermore since the retention of this work product until that material was relied upon by experts was substantially justified. Roberts ex rel. Johnson v. Galen of Virginia, Inc., 325 F. 3d 776 (6th. Cir. 2003).

      Alternatively, if any harm should be found by the Court or the Court should not find that withholding the witness interviews was not substantially justified, Rule 37(c)(1) permits the Court to provide other relief as a sanction. The Court would be prayed in the interests of justice against same but otherwise to deny the drastic measure sought by the defense of keeping literal witness accounts from the jury of the accident itself and the pain and suffering Ms. Noble experienced in its aftermath before she slipped into unconsciousness. To ask that the Court suppress these poignant last moments of Ms. Lisa Noble's life is asking when the defense was specifically on notice of the allegations of these matters in the Complaint is Draconian. The fact that as she sat in her car, with the top shorn away, bleeding, gasping, moving, and then was comforted in prayer should be known to the jury in the interests of justice. These are the facts that these Defendants want this Court to sanitize from their case. The record is clear that the defense knew these events occurred at the scene – Defendant Cooper having witnessed them.

      From the date of the crash forward, the defense knew that Ms. Saylor and Ms. Moore were material scene witnesses to Ms. Noble's condition after the crash. Any bias they may have against the defense was clear from their KSP statements. It is hard to fathom one clicking the picture appearing above in this brief after having just been involved in this horrific crash. The

defense had a picture taken of these Good Samaritans by Mr. Cooper himself, had their identities and addresses, and knew that Defendant Cooper had witnessed them talking and praying with Ms. Noble as she "moved around" in her car before emergency responders arrived. Defendant Cooper did not even believe Ms. Noble's injuries were life threatening according to his boss to whom he reported the crash... Though initially seeking these depositions in October 2017, the defense sat and did not take them once the KSP file was obtained and they knew the extent of what these folks witnessed and how they felt about Defendant Cooper's conduct. Still, nothing was done. Now it is clear why that may be the case – if it was not neglect, it was surely strategy. It is prayed that the Court not reward such conduct.  Rather, should the Court find that some harm resulted because of actions of the Plaintiff or that the actions of the Plaintiff were not substantially justified, the Court is asked for a lesser sanction under Rule 37(c)(1).  If the Court believes such a sanction is in order, it could simply fashion a sanction of an instruction to the jury, advising that the jury may infer bias or disregard the statements of these witnesses, informing the jury of the failure under Rule 37 (c)(1)(B).

## Conclusion.

This process appears to be an attempt to deny justice to Ms. Noble by keeping the long known and litigated circumstances of the horrific death she suffered in the unsympathetic presence of Defendant Terran Cooper from the ears of the jury that will hear this case. The Motion at bar should fail; alternatively, if the Court should find the Plaintiff's actions were not substantially justified, or that some harm result from a failure to timely and properly supplement or make its disclosures, an instruction to the jury as to what occurred would remedy any such harm.

Respectfully submitted,

/s/Timothy D. Lange
Timothy D. Lange
BENSON, RISCH & LANGE, PLLC
401 W. Main Street, Suite 2150
Louisville, Kentucky 40202
Telephone: (502) 583-8373

D. Randall Jewell
JEWELL LAW OFFICE, PLLC
P.O. Drawer 670
Barbourville, Kentucky  40906
Telephone:  (606) 546-9714

Billy J. Taylor
TAYLOR LAW OFFICE, PLLC
110 Knox Street, Suite A
Barbourville, Kentucky 40906
Telephone:  (606) 545-0224

ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE**

It is hereby certified that on the foregoing was filed November 27th, 2018 with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/    Timothy D. Lange
TIMOTHY D. LANGE