

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# KENTUCKIANA
## COURT REPORTERS

### CIVIL ACTION NO.: 6:17-157-KKC

### DAVID WILSON, AS ADMINISTRATOR OF THE

### ESTATE OF LISA NOBLE, DECEASED

### VS.

### BEACON TRANSPORT, LLC AND TERRAN COOPER

### DEPONENT:

### DR. WILLIAM SMOCK

### DATE:

### OCTOBER 11, 2018



EXHIBIT
F
_____



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1   see no evidence of that in the medical record, that

2   there was a basilar skull fracture or enough force to

3   create a basilar skull fracture.

4       Q      Could you tell the ladies and gentlemen of the

5   jury what raccoon eye phenomenon is, relative to a

6   basilar skull fracture?

7       A      Actually, raccoon eyes are unrelated to a

8   basilar skull fracture.  Raccoon eyes are related to

9   ecchymosis and blood dissecting down from the frontal

10  area of the brain. Totally different area of the brain.

11      Q      Is it evidence of a traumatic brain injury?

12      A      No.  It's not evidence of a traumatic brain

13  injury. It's evidence of bleeding somewhere within the

14  face or cranial vault.

15      Q      And I'm sorry.  Say that one more time.  Or

16  cranial Involvement [sic]?

17      A      Or cranial vault.  The presence the raccoon

18  eyes, which is ecchymosis, or blood surrounding the

19  eyes, sometimes referred to as periorbital ecchymosis,

20  is evidence of bleeding into tissue around the eyes;

21  which can come from blunt force trauma to the eye, to

22  the face, or the dissection of blood from within the

23  cranial vault.

24      Q      Okay.  And so that I'm clear, you are

25  testifying that black eyes immediately after this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    accident would indicate facial trauma?

2         A    That is correct.

3         Q    Fair enough.  On a Glasgow Coma Scale, what

4    level does a person feel conscious pain, if you were

5    applying the Glasgow

6    Coma Scale scale to the that, to the same?

7         A    When you look at -- there are different levels

8    of response to a Glasgow Coma Scale:  eye opening, motor

9    response, and verbal response.  The way a physician

10   would evaluate that is:  Is there -- does the patient

11   move with specific testing, meaning do they respond to

12   verbal stimuli, painful stimuli?

13        Q    And there's a specific way to test, under the

14   Glasgow Coma Scale, for movement, correct?

15        A    That is correct.

16        Q    Basically, take a patient's arm or some other

17   extremity, lift it up and then drop it; that's one way?

18        A    That would be -- actually, that's the test

19   that I use to -- is a patient awake or not.  You take

20   the hand and you put it in front of their face, and then

21   you drop it.  If they are awake, they will not hit their

22   face.  If they are unconscious, the hand will hit the

23   face.

24        Q    I never thought about it that way, but that's

25   a pretty good test.  So -- and again, my question was --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of  DR. WILLIAM SMOCK taken on October 11, 2018
Confidential                                                                46

1  and we got off track a little bit.  But is there a

2  minimal level on the Glasgow

3  Coma Scale that you, as a clinical physician, can

4  determine that a person would or would not feel pain?

5      A    No.  I believe the -- because there are three

6  different areas of the Glasgow Coma Scale:  It's verbal,

7  motor and eye movement.  So depending upon how the

8  stimuli is applied, what are we asking the patient to

9  do, you know, are they responding to the clinician?

10     Q    Okay.  Correct me if I'm wrong, but the

11  Glasgow Coma Scale basically goes from 0 to 15, or 3 to

12  15, correct?

13     A    3 to 15 is correct.

14     Q    It's a numerical objective way of determining

15  how -- whether a person is conscious or -- correct?

16     A    No.  It is a numeric evaluation of a

17  clinician's assessment of a particular patient for those

18  areas that we've talked about.  It is a scale that looks

19  at the patient's response.

20     Q    Okay.  In your opinion, is there a number at

21  which a patient would feel pain or not feel pain on that

22  scale?

23     A    You base it upon their response.  Do they

24  withdrawal to painful stimuli?  What is their response

25  to painful stimuli? Do they have a response?  Are they -

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 6:17-cv-00157-CHB-HAI Doc #: 122-3 Filed: 12/18/18 Page: 5 of 18 - Page ID#:
2015
The Deposition of DR. WILLIAM SMOCK taken on October 11, 2018
Confidential                                                                    47

1    - is the way I evaluate -- does a patient feel pain?

2        Q    Okay.  But -- and Doctor, I understand, but

3    that's not the question I'm asking.  The question that

4    I'm asking is:  Is there a specific number; is it a 3, a

5    4, a 5, a 6, you know, up to 15, where you feel

6    comfortable telling me that a patient would or would not

7    feel pain?

8        A    It's a -- kind of a summary of all those three

9    scales. How does that particular patient respond?  They

10   may have their eyes closed and not respond at all, but

11   when I apply noxious stimuli they move, which tells me

12   they are feeling pain.

13       Q    I understand that, Doctor, but my question --

14   that's not my question.

15       A    I'm sorry.  Maybe I misunderstood.

16       Q    We have agreed that the Glasgow Coma Scale is

17   a numeric scale to basically assess a patient's

18   consciousness or lack therefore.  Is there a number on

19   that scale at which is kind of break point to where a

20   patient would or would not feel pain, that you could

21   advise me?  Is that number 3?  Is it a 4? Is it a 5?  Is

22   it a 6?

23       A    I think it is -- in my experience that it

24   varies from patient to patient, depending upon which

25   number in which of those three categories we're

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   evaluating a patient.  I'm not sure

2   I can answer your question, is there a specific number,

3   because I've seen, at least in my patients, patients at

4   different numbers respond to painful stimuli.

5       Q    Okay.

6       A    So there isn't -- a 3, I would not expect them

7   to respond.

8       Q    Fair enough.  And that's kind of what I'm

9   getting at with you.  At a 15, you would expect a

10  patient to respond to painful stimuli, correct?

11      A    Yes, sir.

12      Q    At 15, you would expect a person to feel pain

13  and suffering, correct?

14      A    Yes, sir.

15      Q    And then opposite, when you see someone or

16  evaluate a patient that is a 3 on the Glasgow Coma

17  Scale, you don't expect that patient to respond to

18  painful stimuli, do you?

19      A    That is correct.

20      Q    And thus, in turn, you would not, as a

21  clinician, expect that person to actually feel pain and

22  suffering, correct?

23      A    Conscious pain and suffering, that is correct,

24  at a 3.

25      Q    In this, given the property damage that you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    have observed to the Noble vehicle, would you have an

2    opinion as to whether or not she suffered a brain injury

3    in this case?

4         A    I think it's certainly possible that she

5    sustained a brain injury, but we have no evidence, other

6    than the evidence of facial trauma, that she did.

7         Q    In your opinion, Doctor, what killed Lisa

8    Noble?

9         A    Blunt force trauma.

10        Q    To her body or her head, or both?

11        A    Certainly she had evidence of blunt force

12   trauma to her head, chest, and abdomen.  The

13   documentation in the medical record that she had

14   abdominal extension would indicate that she died of

15   exsanguination into her abdomen.

16        Q    In this situation, can you rule out any

17   carotid artery involvement?  And I'm referring to Ms.

18   Noble, of course.

19        A    I have no evidence of any carotid artery

20   injury, no evidence of that.

21        Q    And correct me if I'm wrong, but on page 3 of

22   your report, in the first paragraph, second sentence,

23   you write, "The medical records indicated evidence of a

24   severe head injury, and chest x-ray revealed multiple

25   rib fractures"?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   sort of a gurgle.

2          Q       Okay.

3          A       Tammy talked to her until paramedics arrived.

4          Q       Do you have a clinical opinion of what that

5   gurgle represented?

6          A       That would be an airway obstruction with a

7   fluid, typically blood.  And based upon the fact that

8   she had a bloody nose and blood in her mouth, that, I

9   would assume, is the fluid causing the gurgle.

10         Q       Could it also represent agonal breathing?

11         A       No.  That is a totally different phenomenon.

12         Q       Did the EMTs later indicate agonal breathing

13  in the EMT run report?

14         A       Yes, sir, they did.

15         Q       Okay.  And so as we sit here today, your

16  testimony is that you are able to clinically determine

17  that the statement provided by Ms. Moore immediately

18  after this accident does not indicate agonal breathing?

19         A       That is correct.  There's a difference between

20  agonal breathing and gurgling.

21         Q       Is that an issue that you would like to have

22  further information about in order to definitively rule

23  that out?

24         A       No.  The description of gurgle -- that is

25  airway obstruction, you know.  Something is in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of  DR. WILLIAM SMOCK taken on October 11, 2018
Confidential                                                                    62

1    airway.  So when air is either coming in or going out it

2    is coming into contact with something that causes

3    someone to hear gurgling.

4        Q    So in your clinical opinion it's an absolute

5    certainty as we sit here today that that statement is

6    not describing agonal breathing?

7        A    Yes.  Those are two separate observations.

8    Agonal breathing is a different phenomenon than

9    gurgling.

10       Q    Okay.  If Ms. Noble was in agonal breathing

11   immediately after this accident, is she conscious or

12   unconscious at the time of the agonal breathing?

13       A    The determination of level of consciousness is

14   what is the patient's response to stimuli, verbal

15   stimuli and painful stimuli.  That -- agonal breathing

16   is not necessarily related to an individual's level of

17   consciousness, their ability to perceive.

18       Q    Could you define for the ladies and gentlemen

19   of the jury what agonal breathing is, please?

20       A    Certainly.  Agonal breathing is what is

21   observed prior to death.  It is the breathing that can

22   be, what I've seen, at least in my experience, is where

23   they maybe take a deep breath and then pause, take

24   another deep breath, and then maybe become shallow.  It

25   is not the normal respiratory rate or depth of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    respiration.

2         Q    Is it uncommon or common for a layperson to

3    understand that a person is -- do lay people often

4    recognize or not recognize when a person starts agonal

5    breathing?

6         A    I would -- the ability to recognize agonal

7    breathing is something that I would refer to a medical

8    professional.  I would not suspect lay individuals would

9    understand or recognize what agonal breathing is, unless

10   they've had some additional training.

11        Q    Okay.  In the subsequent statements given by

12   Tammy Saylor to Joey Stidham's firm, Stidham

13   Reconstruction, on page 7 of 19, Ms. Saylor wrote -- or

14   Ms. Saylor said -- I'll give you an opportunity to pull

15   it up.

16        A    You may want to show it to me.

17        Q    I'll let you take a look at it.  At that point

18   in time on -- beginning on line 6, she said, "We checked

19   her pulse, we tried to talk to her.  I mean, she was

20   breathing at that time.  I could tell that her eyes were

21   already set, that she was already gone."  And that's

22   what she -- that's what Ms. Saylor said in that

23   statement, correct?

24        A    Yes, sir.

25        Q    Now, that statement in and of itself would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of  DR. WILLIAM SMITH, taken on October 11, 2018
Confidential                                                    64

1   tend not to indicate any conscious pain and suffering,

2   would it?

3        A    That is correct.

4        Q    Thank you, Doctor.  And then -- and I'm

5   looking at page 9.48, and the question was, "Uh-huh.

6   And then at this point Ms. Saylor says she was gurgling,

7   and I always heard that if you ever heard, you know,

8   what it was like, a death rattle.  So you know, I am

9   assuming that she was just going but, yeah, she, I'm

10  confident that she heard me coming because she didn't

11  let go of my hand." Now, here in this particular

12  description, where Ms. Saylor is testifying, you would

13  agree with me that she specifically refers to the term

14  "death rattle," doesn't she?

15       A    She does.

16       Q    And from -- would it be safe to assume that a

17  -- someone with some medical training, such as Ms.

18  Saylor, understands what a death rattle is?

19            MR. LANGE:  Objection to the form of the

20       question.

21       Q    I mean, that's a specific terminology that's

22  used by medical professionals, correct?

23       A    May or may not be used by medical people.  And

24  I have don't know what Ms. Saylor means by "death

25  rattle."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  gathered when you take the deposition of Ms. Saylor.

2  But based upon the information that I've received, this

3  appears to be voluntarily movement.

4        Q    Okay.  I understand that and your

5  interpretation of the situation.  I understand that.

6  But my question doesn't involve your interpretation.  My

7  question involves being able to definitely, within a

8  reasonable certainly, rule out that all they saw that

9  day was just some involuntarily jerking of a pinkie.

10 And you can't do that today, Doctor?

11            MR. LANGE:  Objection to the form of the

12        question. Misstates facts in evidence.

13       A    Based upon the information that I've reviewed,

14 and the statements of the -- Ms. Saylor, who was there

15 and holding her hand, Ms. Saylor is the one who feels

16 this was in response to her interaction with Ms. Noble.

17 This does not appear to be involuntarily based upon the

18 information reviewed.

19       Q    And again, I'm reading Ms. Saylor's statement.

20 "We checked her pulse, we tried to talk to her.  I mean,

21 she was breathing at that time.  I could tell that her

22 eyes were already set and that she was already gone."

23 Doctor, does that tell you that the woman -- that Ms.

24 Noble had already passed?

25       A    I'm not sure where in that seven-minute period

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. WILLIAM SMOCK, taken on October 11, 2018
Confidential                                                    73

1  from the time of the wreck -- or seven-plus minutes from

2  the time of the wreck until EMS got there, what had

3  changed over that period, and at what point during that

4  seven-plus minute period she was holding her hand, and

5  at what point in the timeline that references.

6      Q     And these are not my words, but it says, "We

7  managed to get the door open," correct?  "We managed to

8  get the door open. We checked her pulse.  We tried to

9  talk to her.  I mean, she was breathing at the time.  I

10  could tell her eyes were already set and that she was

11  already gone."  Now, if you are given that description

12  from a witness at the accident, that description tells

13  you that that person is dead, correct?

14      A     No, sir, that person is not dead.  That person

15  has a pulse.

16      Q     Okay.  But from that description, you cannot

17  affirmatively state within a reasonable medical

18  probability that the patient was suffering from any

19  conscious pain and suffering, correct?

20      A     Based upon on that statement, that is correct.

21      Q     Okay.  We touched upon this for just a minute,

22  but in this situation, under Kentucky law, what does it

23  take to pronounce somebody dead, deceased?

24      A     That is, from a medical provider, that there

25  is absence of pulse, absence of respiration, normal

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    temperature.

2        Q    And I'm asking a really goofy question, but do

3    you have to be a doctor or a coroner to be able to make

4    that pronouncement?

5        A    No.  I have EMTs, paramedics, who make that

6    pronouncement.

7        Q    Okay.  In regard to Ms. Noble's death

8    certificate, it says approximately -- approximate time

9    of death 11:30?

10       A    That's correct.

11       Q    Okay.  So based on the fact that it's

12   approximate, we really don't really know when she

13   passed?

14       A    The 11:30 time is when they ceased

15   resuscitative efforts.

16       Q    Okay.  Any reason to disagree with the fact

17   that that's an approximate time of death?

18       A    No, that's --

19       Q    That's what it says?

20       A    That's -- based upon on the medical record,

21   that's when the physician, after ten minutes of

22   resuscitative effort, pronounced her.

23       Q    Prior to 11:30, when did she enter into any

24   period of consciousness in which she might have felt

25   pain, from a time standpoint?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     That would have been sometime after the wreck,

2    when Ms. Saylor was in contact with her.

3        Q     Was that 11:29, 11:02, 10:48, 10:49, 10:52?

4        A     We know that the dispatch received a call at

5    approximately 10:45.  EMS arrived on scene at 10:52.  So

6    at some point prior to when dispatch was notified, when

7    Ms. Saylor was there on the scene with her.

8        Q     What does the word "some" mean to you,

9    "sometime"?

10       A     An approximate time.

11       Q     When you write your medical literature or

12   opinions to be peer reviewed, would you use the word

13   "sometime" in any of those reports?

14       A     Probably not, sir.

15       Q     Thank you.  It's because it's highly

16   speculative in nature, isn't it?

17             MR. LANGE:  Objection.

18       A     I'm not sure it's speculative.  It's not a

19   word I would use.  I would use approximately a given

20   time.

21       Q     All right.  But sometime is not definitive.

22   If I look at my 5-year-old son and tell him sometime

23   we'll go to the park, that is a definitive analysis upon

24   which a 5-year old is going to rely on very well, but it

25   doesn't give him any idea of when we're going to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    park, does it?

2         A    It does not, sir.

3         Q    And similarly, in this situation, sometime --

4    when you tell either the court or the jury in this

5    particular fact pattern, sometime between X and Y, that

6    doesn't give the court or I, or the jury, for that

7    matter, any real understanding of what the time period

8    might have been to which your opinions apply, correct?

9         A    My opinions would apply based upon the

10   information that we have, that sometime between when the

11   wreck occurred --

12        Q    Okay.

13        A    -- and when Ms. Saylor was with Ms. Noble,

14   that is the time period.

15        Q    Is that 30 seconds, minute-and-a-half, 45

16   seconds, 15 seconds, minute-and-a-half?

17        A    If we look at the -- when the dispatch

18   received the call, which was 10:45, the wreck would have

19   occurred prior to that time.  We know when EMS arrived

20   on scene seven minutes later.

21        Q    Okay.  Do you know definitively when the wreck

22   occurred?

23        A    We know when it was reported.  Do I know

24   precisely the minute and second?  No.

25        Q    Within a reasonable certainty is there any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of  DR. WILLIAM SMOCK, taken on October 11, 2018
Confidential                                                            77

1  specific time period that you can point to, to say, ah-

2  ha, here's conscious pain and suffering, as in 10:48,

3  10:49, 10:42, 10:35?

4      A    As far as the timeline, it would be when Ms.

5  Saylor is interacting, whatever time that is, whether

6  it's 10:42, 3, 4, 5, 6, 7, whenever Ms. Saylor is

7  interacting with Ms. Noble and she is getting a

8  response, squeezing of the hand, voluntarily squeezing

9  of the hand, responding to Ms. Saylor's prompting, that

10  would be the time.

11      Q    Okay.

12      A    When Ms. Noble is experiencing conscious pain

13  and suffering.

14      Q    And again, to cover the other end of this, we

15  don't know when that period or purported period of

16  conscious pain and suffering ceased either, do we,

17  within -- was at it 10:49,

18  10:41, 10:48?

19      A    That would be based upon when did Ms. Saylor

20  recognize that Ms. Noble was no longer squeezing her

21  hand in response to her prompts.

22      Q    Okay.  So without further testimony from Ms.

23  Saylor or Ms. Moore, or someone else at the scene of the

24  accident, you cannot testify within a reasonable medical

25  probability as to the specific time that she may have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    been consciously suffering pain and suffering, correct?

2         A    That would be based upon the statements of

3    those witnesses that were there.

4         Q    Okay.  But you can't sit here today and tell

5    me that it lasted four minutes, three minutes, two

6    minutes, or one minute?

7         A    That is correct.  It's going based upon the

8    evaluation -- the response that those witnesses saw from

9    Ms. Noble at the time.

10        Q    And if you were try to do that today, to say

11   five minutes, four minutes, three minutes, two minutes,

12   you're not willing to do that, are you?

13        A    No, sir.

14        Q    Because that would be guesswork, wouldn't it?

15        A    Based on the information that I have, that

16   would be speculative.

17        Q    Okay.  We touched upon the Glasgow Coma Scale,

18   but I want to specifically discuss consciousness with

19   you, Dr. Smock, if I might.  From a clinical-medical

20   standpoint, what is consciousness?

21        A    Consciousness is the ability for a human to

22   respond to stimuli.

23        Q    Have you made any attempt, from a legal

24   perspective, to define consciousness?

25        A    The determination of consciousness is my

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com