UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON
(Electronically Filed)

DAVID WILSON, as Administrator of the )
Estate of Lisa Noble, Deceased, Plaintiff )
                                          )
vs.                                       )
                                          )   CIVIL ACTION NO. 6:17-157-KKC
                                          )
BEACON TRANSPORT, LLC and                 )
TERRAN COOPER, Defendants                 )
                                          )
_____ )

## DEFENDANTS, BEACON TRANSPORT, LLC'S AND TERRAN COOPER'S RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS BASED ON ALLEGED SPOLIATION

Come now the Defendants, Beacon Transport, LLC ("Beacon") and Terran Cooper ("Cooper")(jointly referred to as "Defendants"), by counsel, and for their Response to Plaintiff's Motion for Sanctions based on alleged Spoliation, and state as follows:

## INTRODUCTION

This is a fairly straightforward tort suit wherein Plaintiff, David Wilson, as Administrator of the Estate of Lisa Noble, deceased("Plaintiff" or "Noble"), makes a claim for the wrongful death of Noble from an accident occurring near Williamsburg, Kentucky in the Northbound lanes of Interstate 75 on January 5th, 2017. The primary issue in this case is responsibility for causing Noble to crash into the back of a tractor trailer driven Cooper. Immediately after the accident, it was obvious that Noble was seriously injured. Suffice to say, it was a stressful and serious situation where tension was extremely high.

Whitley County Emergency Medical Services ("EMS") arrived at the scene within minutes. The Plaintiff's decedent's certificate of death, indicates as follows in regard to Noble's cause of death: "… head injury due to trauma… motor vehicle collision."  The proof in the case further indicates that Noble was rendered unconscious by the impact, and expired within a few short minutes.

Apparently, Plaintiff's current Motion has an underlying purpose.  Maybe, Plaintiff wants to distract the Court and Defendants from the simple fact that Plaintiff's liability position is not good given the clear, unadulterated fact that Noble rear-ended Cooper?  Maybe, Plaintiff's Motion is retaliation after Defendants' recent Sanctions' Motion?  Maybe, its simply brought to push the parties toward an agreement?  However, and as will be discussed herein, Plaintiff's Motion is factually inaccurate on several fronts and takes liberties in many areas, so as to inflate Plaintiff's claims of alleged spoliation and paint Defendants in an unfavorable light.

## STATEMENT OF FACTS PERTINENT TO ALLEGED SPOLIATION ISSUE

Beacon has an internal post-accident procedure.  This procedure is compliant with the governing body of law—namely, the Federal Motor Carrier Safety Regulations.  Pursuant to Beacon Policy, Cooper was instructed to "photograph" the scene of the subject accident and the vehicles involved in the subject accident; however, Defendant Cooper did not videotape the scene, the vehicles involved and/or any persons involved in this accident.  Beacon also has no policy to create post-accident video.  Thus, there is (and never was) any video taken by Defendant Cooper to turn over in discovery.  (sic)

Plaintiff's allegations of videotaping are based upon statements made by none other than the infamous twosome, Tammy Saylor and Selena Moore, who by now are well known to the Court.  In particular, Plaintiff relies, in part, upon the affidavit of Tammy Saylor, which was not

disclosed until October, 2018, some six (6) months after the discovery cut off date of April 2, 2018.  In the second instance, Moore's affidavit was even more dilatory in nature, and not disclosed until filed with the Court on December 19th, 2018 in support of a Response to one of Beacon's Summary Judgment Motions—some eight (8) months after the discovery cut off.  See Docket Entries No 123-1 and 123-2.  These two affidavits are the only semblance of any proof of any possible video.  <u>While much will be said about untimeliness in the Argument Section of this Response, it is patently inappropriate to allow Plaintiff to rely on these untimely affidavits from non-disclosed witnesses filed months beyond the Discovery Cut Off Date, since Defendant has no way to cross examine the affiants.</u>  (emphasis ours)

Saylor's and Moore's testimony is also the subject of Defendants' own Fed. R. Civ. Proc 37 © Motion, wherein the Magistrate has already ruled the Saylor's and Moore's statements and affidavits were not timely produced by the Plaintiff,  and if for no other reason than consistency purposes, should be the 'death knell' to Plaintiff's reliance on the same.  See Magistrate's Order at Docket Entry No. 121; Granting in part, denying in part Defendants' Fed. R. Civ. Proc. 37 (c) Motion.

Defendants do not deny that Defendant Cooper had his phone in his hand after the accident.  In this age, most people crawl out of bed in the morning and carry their cellular phones from the beginning of a day to its end.   Again, Beacon's post-accident protocol required Beacon's drivers to photograph the scene and vehicles; however, Defendant Cooper did not take any video at the scene. Cooper simply photographed the scene and the vehicles, and got back in his truck.  [Michael Anderson deposition, p. 27; Exhibit "A"]  Anderson testified by deposition that Cooper was taking pictures, and then Cooper got back in his truck.  [Anderson deposition, p. 27]

3

Here is a very interesting and telling point which Plaintiff attempts to twist by claiming Defendants only turned over ten (10) photographs in prelitigation discovery. Page 146 of Cooper's deposition on February 19, 2018 is attached hereto as part of Exhibit "F." Exhibit 21 to Cooper's deposition, also included in Exhibit "F", are the very same photographs of two (2) women surrounding Noble's vehicle set out on page 17 of Plaintiff's current Motion. Admittedly, Defendant informally turned over these photographs, which is what happens quite often in cases. At the time of disclosure, the Defendants, including Cooper, had no idea who these women were.

Defendants now know based on Plaintiff's Motion that these two ladies are apparently Saylor and Moore. The Court will kindly note two important points: (1) Plaintiff had the pictures they use to argue is proof of wrongdoing by Defendants on February 19, 2018, and (2) given Plaintiff's cancellation of Saylor's and Moore's depositions ( and to specifically include time stamps in Plaintiff's accident reconstructionist, Joey Stidham's electronic files), Plaintiffs had met with Saylor and Moore in February, 2017 before Cooper's deposition. This is a 'red herring' of the most prolific scale. Any and all photographs in the Defendants' possession have been turned over to the Plaintiff during discovery. Discovery often gets accomplished informally. To boot, there was discovery motion filed by Plaintiff on this issue.

Prelitigation disclosures were admittedly hurried. Undersigned counsel was hired late, and an investigation on going. After Plaintiff's counsel's March 3rd letter, Responsive documents were sent within (10) days on March 13, 2017. During discovery, the Plaintiff obtained a digital copy of Beacon's file containing the photographs and a second copy for comparison via a download of Cooper's cellular phone. As any attorney knows, the Discovery Period is the proper time to get any and all information. Much more will be said about the latter

later, but this is a very good example of Plaintiff's attempts at exaggeration geared to attempt paint the Defendants in a bad light.

After the accident of January 5, 2017, and when Defendant Cooper returned to his Beacon's terminal in LaVergne, Tennessee, Cooper's photographs were transferred from his phone by Lisa Milom, an Executive Assistant to Beacon's Chief Executive Officer. Milom saved Cooper's photographs to a hard drive at Beacon's home office where they remain to this day. [Milom deposition, pp. 15-16; See Exhibit "B"] While Milom did not conduct a 'download' of Cooper's phone per se, Milom, without reservation, confirmed that there was no video on Cooper's phone—only the photographs she copied. [Lisa Milom deposition, p. 16]

Defendants have not had the opportunity to specifically contest by cross examination either Saylor's and Moore's claims that Cooper videoed the scene or the vehicles. Defendants submit that Plaintiff or Plaintiff's accident reconstructionist suggested the wording in Moore's and Saylor's affidavits for the specific purpose of manufacturing a purported spoliation issue, as has been the case with the ever-evolving testimony of Saylor and Moore through the several dilatorily disclosed statements and video provided by the two. Why else would Plaintiff send Plaintiff's accident reconstructionist for multiple statements, video and affidavits from Saylor and Moore? Moreover, the statements, video and affidavits of these two untimely witnesses seem to deliberately mutate under the manipulation of Plaintiff's accident reconstructionist, Joey Stidham, in the most untimely fashion like a rabid cancer interrupting a remission period. Defendants still scratch their heads as to why Plaintiff unilaterally cancelled Saylor's and Moore's depositions in February, 2018—all the while knowing Plaintiff had just taken Saylor's and Moore's statements? But again, the affidavits of Saylor and Moore referenced were not disclosed until months after the discovery cut off of April 2, 2018. The whole Saylor and Moore

conundrum has left Defendants feeling as if they are being forced to play the "Legal Edition" of "Whac-A-Mole" with no end in sight.

Immediately following this accident, Defendant Cooper was interviewed by law enforcement, drug tested, his vehicle inspected, and then instructed to have a tail lamp fixed and a leaky trailer brake line fixed.  Law enforcement's post-accident reporting contains a specific inspection of the Cooper tractor and trailer, and objectively determines the condition of both the tractor and trailer as of the date of the accident. Thereafter, Defendant Cooper's tractor and trailer remained in service and continued carrying the tires he was hauling to their final destination.  When Cooper left, he was not aware that Noble had passed.  In fact, Cooper and Beacon would become aware of her passing well after the fact.

After returning from the accident, Cooper also met with Beacon's safety director, Jeff Knittel. Cooper advised Knittel there was no video to be preserved, because Cooper had not taken any video.  [Knittel deposition, p. 21; See Composite Exhibit "C"]  Pursuant to Beacon's internal post-accident policy, Knittel further testified he downloaded the Omnitracs/Qualcom systems to his computer using the stated software programs.  [Knittel, p. 17]  Here is yet another point where Plaintiff and Defendants disagree markedly.  Knittel pulled and saved items Beacon standardly saves pursuant to industry custom in the trucking industry.  Now that Plaintiff's case is not going well, Plaintiff wants to use 'smoke and mirrors' to try to Cause this Court to turn the case back to Plaintiff's advantage based upon Defendants' purported failures to save every last item, detail or 'pimple on a freckle' right down to the last molecule of dust on the dash of Cooper's truck on January 5, 2017.  Defendants simply are not required to do this.  And, the Plaintiff's current posturing is a significant waste of time and judicial resources.

6

Critically, Knittel testified there is a four (4) month retention of Omnitracs/Qualcomm data—unless saved. Knittel specifically testified there were no Qualcom messages to, or from Cooper on the date of the accident. [Knittel Deposition, p. 10.] Admittedly, the download in question produced GPS data for Cooper's movements immediately prior to the subject accident including his speeds and Cooper's driver's logs. Defendants produced the GPS data for the day of the accident and driver's logs for a seven (7) day period. [See attached Composite Exhibit "D"] In fact, GPS data is marked by Defendants' bates stamping as 'Estate of Lisa Nobles' (sic) 105-107. A Qtracs Report was also tendered with Defendants' disclosures and was bates stamped document number 146. And, it further merits mention that bates stamped documents numbers 105 through 107 were attached as Exhibit "19" to Cooper's deposition by the Plaintiff. [Cooper deposition, p. 146]

Pursuant to the Federal Motor Carrier Regulations, Defendant has also preserved a much, much longer period of time of Cooper's driver logs; however, Plaintiff accepted these documents as responsive to the Omnitracs/Qualcomm issue. And, Knittel advised Plaintiff during his deposition he still had in his possession the electronic file he downloaded from Cooper's truck. [Knittel deposition, p. 15] To wit: the file was preserved, and still exists to this day. Plaintiff did not move to compel its production.

With respect to both Cooper's Deposition Notice by Plaintiff and Beacon's 30 B 6 Notice of Deposition by Plaintiff, Defendants filed specific objections to both Cooper's Deposition Notice and Beacon's 30 B 6 Notice. In fact, Defendants' counsel re-raised the objections at the beginning of depositions. This further placed the Plaintiff on notice of Defendants' Objections, and that there was no meeting of the minds. Plaintiff chose not to address the issue to this Court when it might have been ripe. See Docket Entries Number 43 for an example of the objections.

Plaintiff again ACCEPTED the limited period of time Defendants produced Cooper's driver's logs and the GPS coordinates delivered prelitigation.  After suit was filed, Defendants again responded with the same documents, but stated specific objections to providing time periods and/or documents beyond the stated materials.  Defendants submits that Plaintiff's Motion has all the markings of an attempt to reopen discovery through a backdoor, long after it was ordered shut by this Court.

Knittel's testimony is crystal clear that there were no Qualcomm messages regarding the subject accident.  Rather, the only Qualcom message within the window of the accident was a subsequent load offer after the subject accident (which was not relevant to this accident and was not formally produced by Defendants).  [Knittel deposition, p. 19]     Again, Defendants filed an objection to the same which was never contested.  In fact, Defendants spent considerable time and effort going through its electronics post-accident.  Defendant turned over materials required by the Federal Motor Carrier Regulations and additional materials which were relevant and non-objectionable including, but not limited to, internal email chain regarding the subject accident, which was not particularly friendly to the Defendants. Plaintiff spent a significant amount of time cross examining Defendants' employees over this particular internal email chain.   A copy of the email is attached hereto as Exhibit "E."  This should demonstrate that the Defendants did not hide damning evidence which was otherwise not objectionable.  Again, it is submitted that the Plaintiff is misleading this Court, because Defendants operated fairly and followed the Civil Rules.

Context makes a great amount of difference.  After any accident Beacon's truck drivers are instructed to "phone in" after any accident.  Cooper called Billie Joe Little, a Dispatcher with

Beacon.  Cooper testified that he contacted by phone his "Driver Manger," Billie Joe Little, at

Beacon to notify it of the subject accident:

> THE COURT REPORTER: Uh-huh. (Whereupon, the referred to document was marked as Exhibit 9, and is attached hereto and made a part hereof.)
>
> MR. LANGE: So 10 will be this email.
>
> THE COURT REPORTER:··Let me just put this sticker on there. (Whereupon, the referred to document was marked as Exhibit 10, and is attached hereto and made a part hereof.)
>
> Q. And it looks like this is an email from Randy Cummins, director of operations. And it says, "Serious accident this morning in Corbin, Kentucky involving Laurens to Wilmington Load B271236. Terran stated that he was in the left lane looking to move over to the right, going up incline when elderly lady hit the right rear side of the -- right rear of the trailer." Did you tell Randy Cummins that?
>
> A. Tell him what?
>
> Q. That you were in the left lane looking to move over to the right going up an incline when an elderly lady hit the right rear of the trailer?
>
> A. Yes.
>
> Q. Okay.··And who is Randy Cummins?
>
> A. Randy Cummins basically is my boss.
>
> Q. Okay. So when you called in, you spoke to your boss, Randy Cummins, from the scene of the crash?
>
> A. I don't know. All I know I talked with safety.
>
> Q. Okay. At the point that you called in, had you already taken your photographs?
>
> A. When I called in? No. No photos were taken at that time.
>
> Q. Okay.··So you hadn't got out of your truck by the time that you called in?
>
> A. No.
>
> Q. Okay.
>
> A. I had to follow procedures.
>
> Q. All right.··Did you tell Randy that Ms. Noble was taken to the hospital with serious, but appear non-life-threatening injuries?
>
> A. No, I did not.
>
> Q. Do you know how that information got in this email?
>
> A. I don't know.
>
> Q. Okay. Did you tell the Kentucky State Police that you were taken to the hospital for the blood test and that you passed?
>
> A. Yes.
>
> Q. All righty.
>
> A. That's a -- that is a requirement.

Q. It looks like this memo says, "Was instructed to not break the seal for any reason. We will have to get trailer repaired when empty after dropping at Wilmington." Is that what they told you?

A. No. Procedure is, once I was released by the inspecting officer, automatically my duties are to repair the trailer and get it signed off on.

Q. Did they tell you where to take it?

A. No.

Q. How did you know where to go?

A. Every truck stop has a repair shop, basically. I was in Corbin, Kentucky.

Q. Are you able to look that up on your GPS device? Will it tell you where the next one is?

Q. Okay.

MR. LANGE: So I'd also like to request the download of the Garmin GPS device that was made. Can you keep a list of these as we're going along on the requests?

MR. JUDD: I hope so.

MR. LANGE: I forgot to ask you that. Otherwise --

THE COURT REPORTER: Yes.

MR. LANGE: -- I have to go back and try to re-create it myself.

*· ··*· ··* CONTINUING EXAMINATION

BY MR. LANGE:

Q. Did you only speak with one person when you called in from the crash scene at Beacon?

A. No. I'm required to talk to three people.

Q. Do you know any names of the folks you talked to?

A. No, I don't. I know titles.

Q. Okay. Q. All right. And was that procedure mandatory?

A. Yes, it was.

Q. So we've got some documents that are a part of, evidently, your personnel file. And I'm going to walk you through these. I don't do it to embarrass you, you know, but they're write-ups at work or whatnot, so...

MR. LANGE: Let me hand you what we'll mark as Exhibit Number 13. (Whereupon, the referred to document was marked as Exhibit 13, and is attached hereto and made a part hereof.)

MR. LANGE: And there's one for your counsel too.

Q. This is a document, Estate of Lisa Noble 98, and it talks about an accident of -- written warning from Billy Jo's board on the action. Do you know who Billy Jo is?

A. Billy Jo is my driver manager.

Q. Okay.··Did you talk to Billy Jo on the day of this crash?

A. First response is to call your drivers manager.

Q. Okay. So from the scene of the accident, was Billy one of the people you spoke to?

10

A. Yes, it was.

Q. And was he your dispatcher?

A. She.

Q. Billy.··I'm sorry. Was Billy your dispatcher?

A. Yes, she was.

Q. All right.

MR. JUDD: Tim, I'm sorry to interrupt, but do I have the right document? You used the word crash, and then this is -- whatever this document is is dealing with...

MR. LANGE: Oh. Well, I probably misspoke with the word crash.

MR. JUDD: Okay.

MR. LANGE: I mean, what I was talking about, from the scene of the crash with Ms. Noble, when he called, did he speak to Billy Jo.

MR. JUDD: Oh, okay. Sorry.

A.      Can I say something?

Q. Sure.

[Cooper deposition pp. 74, 75, 76, 78, 84 and 85; Cooper Deposition Composite Exhibit "F"]

After speaking with Little, Cooper was then "patched through" to Knittel.  Knittel acknowledged speaking with Cooper on January 5, 2017 approximately six (6) times to discuss handling the accident.  [Knittel Deposition, p. 10.]  Cooper likewise advised he called Beacon to discuss the accident.  A Qualcomm message is essentially an email and could sit for hours before being seen.  Hence, the reason Beacon's protocol requires a phone call after an accident— not an email.

By February 3rd, 2017, Plaintiff had retained counsel.  It is acknowledged that Plaintiff did tender an overly broad and burdensome Preservation Letter to the Defendants on or about February 3rd, 2017.  Between February 3rd, and the end of February, 2017, the parties informally agreed to inspections of Defendant Cooper's tractor and trailer in LaVergne, Tennessee on March 3rd, 2017, and the Plaintiff Noble's vehicle in Barbourville, Kentucky in May 16th, 2017—all before suit was filed.  Beacon took both Cooper's truck and tractor out of service for inspection in an attempt to work with Plaintiff.

The date of Plaintiffs initial inspection at Beacon is critical.   Although Beacon acknowledges that we still have an electronic copy of its Omnitracs/Qaulcom data download, Plaintiff was on site and allowed to inspect the Cooper Tractor and Trailer and raised no issue while physically on site regarding downloading the Omnitracs/Qualcomm system March 3rd, 2017—although its accident reconstructionist and trucking expert climbed in or about the tractor and trailer.   In fact, Plaintiff on February 21, 2017 in an email waived downloading Defendant's tractors event data recorder ("EDR"), since the tractor had remained in service.   [See attached Exhibit "G."]   Following the subject accident, there was no mechanical issue with the tractor— only a broken tail light and leaking trailer break line as described in an inspection by law enforcement following the subject accident.

Plaintiff's original Preservation Letter of February 3, 2017 was replaced by a Second Preservation Letter on March 3, 2017.   [See Exhibits "H"]   Points four (4), five (5) and six (6) of Plaintiff's counsel's March 3, 2017 letter requested "all" Qualcomm and Omnitracs data from the date of the accident through the date of the letter.   That type of a request is obviously too broad, and an invasion of privacy.

Defendants did act in 'good faith' by engaging in pre-litigation discovery, and acted in good faith throughout discovery.   In other words, Defendants did not make the Plaintiff file suit to get access to either the tractor, the trailer or documents clearly discoverable.   Documents which Defendants agreed were responsive to Plaintiff's March 3, 2017 Second Preservation Letter were tendered by Defendants to Plaintiff on March 13th, 2017—that is just a ten (10) day turn around. Moreover, Defendants abilities to download were, and are limited, by the software program itself.   Defendants respectfully submit that they reasonably complied by preserving

items required by the Federal Motor Carrier Regulations, and which Plaintiff accepted without objection.

The parties did attempt settlement prior to suit, but to no avail.  Plaintiff filed suit before this Court on June 19, 2017.  In August, 2017, Plaintiff served separate sets of discovery upon Cooper and Beacon.  Thereafter, Defendants asserted objections formally in discovery responses to what Defendants believed were overreaching requests.  Defendants' responses are of record at Docket Entries No. 27 and 28, respectively.   Those objections were not formally contested by Plaintiff at any time by virtue of a Motion to Compel or Motion to Determine the Sufficiency of Objections.  (emphasis ours)   [Copies of Beacon's discovery responses are attached hereto as Exhibit "I."]

In October, 2017, the parties began trying to schedule discovery depositions of the parties.  Cooper's deposition was taken on February 19th, 2018, and David Wilson's deposition was taken on February 22, 2018.  Plaintiff's counsel ambushed Defendants' counsel following Wilson's deposition and demanded that the parties informally conference right then and there in front a Court Reporter following Wilson's deposition to discuss the Cooper phone issue.  [See attached Exhibit "J."]

In regard to Cooper's deposition, he first addressed the issue of photographs taken by him after the accident, when he testified as follows:

> MR. LANGE: We'll mark this as Exhibit Number 2, please.
> (Whereupon, the referred document was marked as Exhibit 2, and is attached hereto and made a part hereof.)
> Q. Did you review any photographs in preparation for your deposition?
> A. Yes.
> Q. What pictures did you look at?
> A. The lawyer -- my lawyer gave me, Mr. Judd, Attorney Judd.
> Q. Okay.··Were there pictures of your truck?
> A. Accident scene and truck.

Q. Okay. Were there pictures of Ms. Noble's vehicle?
A. Yes.
Q. Okay. And did you look at those this morning?
A. Yes.
Q. Okay. Were those pictures that you'd taken?
A. Yes.
Q. Okay. Did you take pictures of Ms. Noble's vehicle and the truck?
A. Yes.
Q. Okay. Did you take pictures of Ms. Noble?
A. No.
Q. Okay. When did you take pictures of her vehicle?
A. Immediately.
Q. Okay.··Right after the crash?
A. There're steps I had to take before --
Q. Okay.
A. I took pictures.
Q. So when you got out of your truck, did you use your camera phone to do that?
A. Yes.
Q. Okay. And was that the phone that you produced today?
A. Yes.
Q. Okay.··Did you take any movies?
A. No.
Q. Okay.··Just still photographs?
A. Still photographs.
Q. How many photographs did you take?
A. Approximately 20.

[Cooper deposition, p. 23-24; See Composite Exhibit "F"]

Plaintiff obviously had photographs of the scene of the accident and vehicles involved based on exhibits utilized by Plaintiff in depositions.  With no wavering whatsoever, Cooper explicitly testified that he did not take any videos, nor did he take any pictures of Noble.  [See Cooper deposition, p. 24]  And, Knittel likewise confirmed he did not see any video, nor was he aware of any video.  [Knittel deposition, p. 16]  While Plaintiff may have informally requested additional information, Defendants did not waive the formal objections already raised.  And, Plaintiff did not formally request any intervention by this Court.  After Cooper's deposition, Defendants believed that Plaintiff seemed to have moved on from the video issue.  In any event,

Defendants remain adamant that Cooper took no video at the scene, but when discovery closed on April 2, 2018, there was no proof in the record of any alleged videography by Cooper. This point is critical.

Moving on to the next issue, and in regard to Cooper's dash cam, Cooper testified as follows:

> Q. Okay. What kind of dash cam did it have, was it only a forward dash cam?
> A. A forward dash cam.
> Q. Was it on at the time of this crash?
> A. Yes, it was.
> Q. Okay.
> A. It didn't record nothing.
> Q. But was it actually running tape at the time of the crash?
> A. Yes.
> Q. So would it have recorded your voice, for instance, if you were in the cabin and you reacted to it or the sound of it?
> A. Yes.
> Q. But it was looking forward --
> A. Forward.
> Q. -- not looking back?
> A. Not looking back.
> Q. Did you ever review that dash cam footage?
> A. You're asking me?
> Q. Did you see it?
> A. Yes. There was nothing on there. It didn't record nothing.
> Q. Okay. But could you see the side angle view of Ms. Noble's vehicle where it came to rest?
> A. No. Basically it didn't record it.
> Q. Okay. Did it capture the responding personnel when they came, you know, the EMS, fire, the witnesses running up, that kind of thing?
> A. I'm not sure, because after that, basically, I'm sure -- they didn't -- a GP -- the recording didn't record anything, that's what they told me.
> Q. Okay.
> A. So -- it was on, though. They said nothing was recorded.
> Q. But you actually saw the video of it?
> A. No. There was no video, no pictures whatsoever.
> Q. Okay.
> A. That I know of.
> Q. Did it have anything beyond a forward view and side view --

A. Just a forward view.
Q. -- rearview? Would it record -- you know, some guys don't like it, because it's like having big brother in the truck, but would it record your face? Could they --
A. No.
Q. -- see you?
A. Just forward view.
Q. Okay. What other equipment did they download from the truck?
A. My GPS.
Q. And the GPS, is that a stand-alone unit GPS or --
A. Stand-alone.
Q. Okay. And who downloaded that?
A. The same personnel the company hired. I'm not really sure who that personnel was, but that personnel came out there and did an inspection of the whole truck.
Q. Was Mr. Judd there with you?
A. No.

[Cooper deposition pg. 61-63]

As outlined above, Cooper testified very clearly the dash cam did not make a recording. Defendants admittedly did not save the dash cam, because it did not make a known video. (emphasis ours)  The dash cam was also Cooper's personal property.  It was not standard issue by Beacon.  Thus, it was outside Beacon's traditional post-accident protocol, and certainly beyond the Federal Motor Carrier Regulations.  Moreover, Plaintiff cross examined Cooper at length about the dash cam and was advised several times that it had not recorded.  Thus, Defendants reasonably believed at the outset (and do know now without equivocation) the dash cam unimportant, non-relevant and not containing any information to produce.  This is yet another example of Plaintiff's attempts to exaggerate the existence of evidence that never existed.

By the time the dash cam issue was raised at Cooper's deposition in February, 2018, and (for argument's sake, if there was any sound), the dash cam was recorded over multiple times.

For that matter, and if there was any sound on the dash cam, it was recorded over before Cooper ever got back to Beacon's terminal in January, 2017.

Garmin dash cams record to a micro SD card which overwrites itself when full.  In other words, the dash cam recorded in a loop.  At best, Cooper's dash cam would have recorded for approximately an hour before re-writing over itself in this looping process.  By the time that Cooper returned to Beacon's terminal following the subject accident, anything on the dash cam was overwritten several times—if it captured anything in the first place.  Again, and as Cooper pointed out, the recording did not capture the accident, because Cooper was struck in the rear of his trailer.  Cooper's testimony is unequivocal that he did not know the dash cam had any relevance whatsoever.

Turning to the issue of "GPS" on board Cooper's truck, a very, careful reading of counsel's questions to Cooper regarding "GPS" is required.  Notably, Plaintiff's questions did not delineate between the Omnitracs/Qualcomm GPS which was downloaded and turned over to Plaintiff.  While Cooper had a personal Garmin GPS, Plaintiff's questioning did not specify which GPS unit Plaintiff's counsel is referring-- the Garmin or the Omnitracs/Qualcomm? Cooper testified "GPS" was downloaded.  This lack of specificity is fatal.  Beacon did not download Cooper's Garmin GPS, because: (1) Beacon did not know it could be downloaded; (2) there was no specific request for the download of the Garmin GPS; and (3) Beacon had already preserved the Omnitracs GPS data.  Moreover, Defendants dispute any duty to download Cooper's Garmin GPS, as it was not mentioned in any Preservation Letter with any specificity by Plaintiff.

Turning to the issue of Cooper's cellular phone, Cooper testified his cell phone was a personal cellphone owned by him.  [Cooper deposition, p. 13, 14, 15 and 16]   In fact, there was

no traditional billing as Cooper's cell phone was a "pay as you go" phone.   Plaintiff's Preservation Letter requests in paragraph thirty-two (32) only "billing" records.  This is not a request the phone itself be preserved. The billing records never possessed by Defendants, nor did they ever exist.  Moreover, Plaintiff's Preservation Letter does not request GPS from Cooper's phone, or anything else.

With respect to general fairness and in the spirit of avoiding hypocrisy, Noble also used a "pay as you go plan" with no traditional billing.  Neither party had billing records to produce. Candidly, little or no information was garnered from Noble's phone, except she was on her way to pick up her kids.  Attorneys typically download cell phones if parties to an accident are utilizing them during an accident, e.g. "distracted driving."  These are not the facts herein for either party.

Cooper acknowledged that his cell phone was erased; however, he denies it was erased to destroy evidence.  By the time Cooper was deposed, he was no longer an employee of Beacon. As Cooper explained in his deposition, his then employer uploaded work related software necessary for his job to his phone which required a factory reset.

Counsel for Plaintiff and Defendants specifically discussed informally resolving the issue by Defendants giving Plaintiff a copy of the down load by Defendants' counsel of Cooper's phone.  [See Cooper deposition, pp. 17, 18, and 19]  Moreover, attached as Exhibit "J", is an again copy of the Plaintiff's informal discovery conference by ambush on February 22, 2018, wherein issues regarding Cooper's phone were resolved by counsel.  Plaintiff's counsel had apparently pre-planned to hold the informal conference and advised everyone but the Defendants' counsel, because the court reporter did not immediately begin tearing down her

court reporting equipment to leave as is customary.  This is mentioned, because it tends to indicate significant forethought on the part of the Plaintiff over the issue.

While Defendants dispute any duty to preserve Cooper's phone, this informal consultation between counsel very clearly establishes that Defendants were acting in good faith by attempting to work with Plaintiff by turning over a copy of the download which consisted over one thousand pages of documents.  Moreover, Defendants recognized that this Court, with Cooper's phone having been erased, would have likely Ordered Defendants' to turn over Defendants' copy of the Cooper download.

On the other hand, the informal conference also establishes Plaintiff's knew of the issue in February, 2018, and that Plaintiff did not raise the matter until now.  After the informal conference set out in attached as Exhibit "J," Defendants' transmitted the download of Cooper's phone.  Defendants believed that the issue was addressed.  If there had been an issue, it was incumbent on Plaintiff to raise the issue and address it—presumably, by deposing Defendants' cellular phone expert from Sword and Shield.  This did not happen, and in the end, the Plaintiff had exactly the same information as Defendants – a download of Cooper's phone which yielded the same identical information as the Noble phone download.

The Court will note that that Plaintiff's expert, Jason Wood's affidavit is dated February, 2018.  Said affidavit was not disclosed prior to the close of discovery on April 2, 2018 In fact, Woods' affidavit was disclosed in January, 2019.  Very telling is that Woods was not named as an expert by Plaintiff's in this matter when Plaintiff's disclosed experts on June 1, 2018.  This is yet another very telling example of Plaintiff's playing fast and loose with the facts in this matter.

Contrary to Plaintiff's assertions, Defendants' expert utilized the very same software program, Cellebrite, to down load the Cooper phone that Plaintiff's expert describes in his

affidavit. This is also the same program utilized to download the Noble phone. There are apparently not very many cellphone download programs on the market, and almost everyone uses the same program. The Court will note that the first paragraph of Plaintiff's expert, Jason Woods' report indicates that he is a "Cellebrite Physical Analyst." Presumably, a download by Defendants' expert using the Cellebrite program, yielded the exact same information that Plaintiff's expert would have obtained. Only the first two (2) pages of Defendants' Cellebrite Report are attached, since the printing would exceed one thousand pages of details. If there was a problem with the transmittal of the Cooper's phone download, why did Plaintiff's Motion for Sanctions for alleged Spoliation only come before the Court in January, 2019—ten (10) months after the download was transmitted? If Defendants' expert likewise used the Cellbrite program to create the download of Cooper's phone which was delivered to Plaintiff, what is the grievance here? More importantly, why was there such a delay in communicating the grievance with the Defendants?

In the end, Plaintiff filed no discovery motions prior to the close of discovery on April 2, 2018. Plaintiff's current Motion for alleged Sanctions for alleged spoliation comes after both Plaintiff's and Defendants' expert disclosures, after taking expert discovery and after the parties' Summary Judgment Deadlines---and clearly involves expert testimony not previously and/or properly disclosed by Plaintiff prior to Plaintiff's Expert Disclosure Deadline on June 1, 2018. At this point, Defendants are now forced to engage in responding to allegations of spoliation based upon a purported new legal doctrine created by the Plaintiff—the "Ipse Dixit" doctrine.[1]

## ARGUMENT

### A.    THE STANDARD APPLICABLE TO SPOLIATION.

---

[1] Ipse dixit (Latin for "he said it himself") is an assertion without proof; or a dogmatic expression of opinion. [1] The fallacy of defending a proposition by baldly asserting that it is "just how it is" distorts the argument by opting out of it entirely: the claimant declares an issue to be intrinsic, and not changeable.[2] Source: *Wikipedia.*

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Owner Operated Ind. Drivers Ass'n v. Comerica Bank,* 860 F. Supp. 2d 519, 537 (S.D. Ohio 2012), aff'd in part and vacated in part on unrelated grounds, 562 F. App'x 312 (6th Cir. 2014).

A party seeking sanctions for an opponent's spoliation of evidence must show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence] was destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice,* 622 F.3d 540, 553 (6th Cir. 2010).

Further, this Court also must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

## B.   PLAINTIFF'S MOTION FOR SANCTIONS IS UNTIMELY.

Civil Rule 37 "governs most motions for discovery sanctions, but it does not contain any specific reference to the timing of a motion seeking spoliation sanctions." *Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 506 (D. Md. 2009); see also, *Am. Nat'l Prop. & Cas. Co. v. Campbell Ins.*, Inc.,  2011 WL 3021399 (M.D. Tenn. July 22, 2011 which relied upon *Goodman, supra*) (The court denied plaintiff's Motion for Sanctions for Spoliation of Evidence as untimely, citing the fact that it had been months since the alleged spoliation was discovered and that discovery had already closed.)

Courts considering sanctions motion have therefore identified five (5) factors relevant to a "discretionary timeliness assessment" of a spoliation motion:

First . . . is how long after the close of discovery the relevant spoliation motion has been made. Second, a court should examine the temporal proximity between a spoliation motion and motions for summary judgment. Third, courts should be wary of any spoliation motion made on the eve of trial. Fourth, courts should consider whether there was any governing deadline for spoliation motions in the scheduling order issued pursuant to Fed. R. Civ. P. 16(b) or by local rule. Finally, the explanation of the moving party as to why the motion was not filed earlier should be considered, if any.

*Keck v. Gander Mtn. Co.,* 2015 WL 6756151, *4 (N.D. Ohio) (Pearson, J.).

Cooper and Beacon submit that Plaintiff's current Motion is untimely under these principles.  Plaintiff's Motion, while clearly retaliatory, was not filed until January 31, 2019, -- nine (9) months after the close of discovery, Plaintiff's and Defendants' Expert Disclosure Deadlines, the Expert Discovery Cutoff, the parties' Summary Judgment Motion Deadline and after Defendant's Motion for Sanctions over the undisclosed statements of Saylor and Moore.  If Defendants' conduct was purportedly so egregious, why was the matter not brought to the Court's attention through motion practice during discovery?

Underlying this entire charade is an attempt by Plaintiff to get this Court to ignore the fact that Plaintiff's Motion is tantamount to a wholesale rejection of this Court's Scheduling Order. (emphasis ours)  Further complicating Plaintiff's position is the affirmative proof the Plaintiff knew, had knowledge and was plainly thinking about these various alleged issues prior to the close of discovery.  Why hold an informal conference with Defendants in February, 2018, and then simply do absolutely nothing before discovery closed?  Accordingly, Plaintiff offers no rationale as to why its current Motion was not timely addressed during the discovery period in this case, or shortly thereafter?

Contrary to Plaintiff's assertions, the very fact that Plaintiff's current Motion arises after the Summary Judgment Motion Deadline in this case dictates its denial as untimely. The case law teaches that spoliation motions that come as part of an opposition to summary judgment, or in a reply in support of a summary-judgment motion, are the ones that face timeliness problems. *Goodman,* supra, 632 F. Supp. 2d at 507 (citing, *Glenn v. Scott Paper Co.*, Civ. A. No. 92-1873, 1993 WL 431161, at *17 n. 3 (D.N.J. Oct. 20, 1993) (spoliation argument used to defend a summary judgment motion was untimely, as the plaintiff did not raise any concerns "during the discovery phase or bring them to the attention of the magistrate [judge]")); *Morse Diesel Int'l, Inc. v. United States*, 81 Fed. Cl. 220, 222 (2008) (plaintiff's spoliation motion, which was filed after the court ruled on the plaintiff's motion for partial summary judgment, was held to be untimely); *Ferrone v. Onorato*, No. 05-303, 2007 WL 2973684, at *10 (W.D.Pa. Oct. 9, 2007) (spoliation argument should have been made in "appropriate discovery motion," and not in "opposition to summary judgment [motion]").

This Court must conduct a "Timeliness Inquiry" when deciding Plaintiff's alleged Spoliation Motions, because this type of motion must be filed as soon as reasonably possible after discovery of the facts that underlie the motion. This is because resolution of spoliation motions are fact intensive, require the Court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it was not preserved. *Goodman,* supra, 632 F. Supp. 2d at 508 (emphasis added).

Recently in *Travelers Prop. Cas. Ins. Co. of Am. v. Mountaineer Gas Co.,* No. 2:15-cv-0959 (S.D.W. Va. Mar. 16, 2018) the issue of "Untimely Spoliation" was addressed. The

*Travelers Property Court* stated that "a party concerned about spoliation" should file its motion "as soon as reasonably possible" after discovering the loss of evidence. The court cited five (5) "non-exhaustive factors" for assessing timeliness. Those included the relationship between the time of filing , the close of discovery and  "whether the spoliation motion was made on the eve of trial".  The factors are notably similar to those set out in *Goodman,* supra.

Here, there was no conference with the Magistrate about spoliation during discovery—although, the parties held an informal conference in front of a court reporter in February, 2018. Plaintiff waited until long after the close of discovery to advise the Court about the alleged spoliation. Similarly, the *Traveler's Court* noted that the aggrieved party did not "bring a proper motion to compel" before moving for sanctions, and that this "lack of diligence runs contrary" to the rules of the court. Instead, "Mountaineer actively litigated this matter" for over a year "…without ever raising this discovery dispute" to the Court. *The Traveler's Court* concluded that the "timing of Mountaineer's motion…belies its true intention."

While Plaintiff's current Motion herein is clearly retaliatory in nature and very clearly following Defendants' Motion for Sanctions, the *Traveler's* Court surmised that Mountaineer was "frustrated by a lack of evidence…in the days winding down to trial," leading to the spoliation claim. Therefore, the *Traveler's* Court denied Mountaineer's motion as untimely filed.

Spoliation issues, which frequently arise late in the game, have great potential to disrupt the pretrial schedule and delay the start of trial. Disruption of our trial schedule are the very concerns which Plaintiff has repeatedly raised with this Court in response to Defendant's discovery motions.  The record in its entirety demonstrates that Plaintiff herein unreasonably delayed the filing of its current spoliation motion.  Nothing in the record shows that Plaintiff took any steps to raise these purported issues prior to the Discovery Cutoff of April 2nd, 2018.

Moreover, the record is void of any explanation for waiting to raise Plaintiff's grievances until after expert disclosures deadlines, expert discovery deadlines, and until after the Summary Judgment Deadline in this matter. Thus, Plaintiff's current Motion for Sanctions is clearly untimely on its face.

**C.    PLAINTIFF'S MOTION IS FOUNDED UPON UNTIMELY, NON-DISCLOSED AFFIDAVITS, IGNORES DULY TAKEN DEPOSITION TESTIMONY AND IGNORES DEFENDANTS FORMAL DISCOVERY OBJECTIONS.    THUS, PLAINTIFF WAIVED THE ISSUE, OR IS BARRED BY LACHES.**

In the first instance, Defendants gave Plaintiff access to its truck and tractor for an onsite inspection at Beacon's terminal in LaVergne, Tennessee in March, 2017. At that time, Plaintiff, and two experts, Joey Stidham and Whitney Morgan, were allowed to examine, inspect, video and basically do whatever they pleased relative to the tractor and trailer involved in the subject accident. All of this occurred prior to suit in this matter. While Plaintiff raises the tractor's electronics in this matter, Plaintiff fails to advise this Court that it waived the issue prior to this inspection. Moreover, Plaintiff made no attempt at formal addressment through either a Motion to Compel and/or Motion to Determine the Sufficiency of any of Defendants' Objections formally set out in discovery responses. Ours is an adversarial system which is predicated upon waiver without formal action.

In addition to waiver, Defendants assert the equitable defense of laches to Plaintiff's current Motion. According to *Black's Law Dictionary*, On Line, "The doctrine of laches is based on the maxim that "equity aids the vigilant and not those who slumber on their rights." The outcome is that a legal right or claim will not be enforced or allowed if a long delay in asserting the right or claim has prejudiced the adverse party. The basis of the doctrine of laches, pursuant to Kentucky law, is that neglect or omission to assert one's rights within a reasonable period of time, where it causes prejudice, injury, disadvantage or a change of position to the other party,

will bar enforcement of that claimant's rights. *Fightmaster v. Leffler*, Ky. App., 556 S.W.2d 180 (1977); *Chapman v. Bradshaw*, Ky., 536 S.W.2d 447 (1976).  Herein, Defendants are prejudiced by Plaintiff's unreasonable delay in making its Motion for alleged spoliation.

It appears that Plaintiff does not fully understand Defendants' usage of Omnitracs/Qualcom programs.  The Federal Motor Carrier Safety Administration instituted a gradual 'phase in' which requires that motor carriers begin utilization of computerized log books to log hours of service.  This was Beacon's primary use for the systems.  Beacon converted to utilization of computerized log books prior to the aforesaid mandate, and was utilizing computerized log books on the date of this accident (although not yet required by law).  Beacon also contracted with Omnitracs for services including, but not limited to GPS tracking and some communication related to load acceptance, assignment, pickup and delivery.  GPS documentation for the day of the accident along with seven (7) days of Cooper's automated log books were provided to Plaintiff prior to litigation, and in response to formal discovery.  Said documents are attached hereto as Exhibit "D."

As Cooper's deposition testimony indicated, he used his cell phone to call Beacon and notify it of the accident. There was no Omnitracs/Qualcomm message from Cooper after the accident.  Communication was by phone.  However, Defendants did turn over an internal email chain concerning the subject accident, but it was in no way connected to Cooper's tractor's electronics.  A copy of the documents provided to Plaintiff comprised some several hundred pages and concerned all manner of topics from Cooper's driver's file to maintenance records on the tractor and trailer in issue.  Plaintiff received fuel receipts, training materials, driver's handbooks, and other information too voluminous to line item for this Court.

Defendant readily admits that it did not produce every item downloaded and preserved, because the information was simply too broad and unduly burdensome. For example, and while the Defendants have preserved Cooper's driver's logs for several months, Defendants produced only seven (7) days of logs before the accident. This Court should also note that Plaintiff never took issue with the same until now. Defendants continue to possess the Omnitracs/Qualcomm download in full to this date.

After suit was filed, the Plaintiff's Preservation letters, contrary to Plaintiff's assertions were never memorialized in any 'Preservation Order' entered by this Court. Defendants have not violated any Order of this Court. This is yet another example of exaggeration. It appears that Plaintiff confuses the Agreed Protective Order at Docket Entries 46 and 47 with an actual 'Preservation Order. The 'Protective Order' at Docket Entries 46 and 47 pertains only to the non-disclosure of personal information on Cooper's phone.

As a part of discovery in this matter, Plaintiff served written discovery on both Cooper and Beacon. Consistent with Defendants' prelitigation production, Defendants responded and objected as follows in Beacon Transport's Responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents:

REQUESTS FOR PRODUCTION:

4]      Mr. Cooper's daily logs and his co-driver's logs (if any) for the day of the collision, and the six month period preceding the collision, together with all material required by 49 C.F.R. 396.8 and 395.15 for the driver(s) involved in the above matter together with the results of any computer program used to check logs as well as all results of any audit of the logs by your company or a third party.

RESPONSE:   Objection.   The requested time period is overly broad and unduly burdensome.   Beacon produced driver logs for Cooper for a reasonable period in regard to the subject accident pre-suit. Plaintiff is again directed to Exhibit A hereto.

24]      All OmniTRAC, Qualcomm, MVPc, QTRACS, OmniExpress, TruckMail, TrailerTRACS, SensorTRACS, JTRACS, and other similar systems data for the six (6) months prior to the collision for this driver and truck.  You are hereby notified that you are required to place your supplier of the above system, as your agent, on notice that they are to save this data.

RESPONSE:  Objection.  Beacon has no obligation to comply with this request, and it far exceeds the requirements of the Federal Civil Rules as it is onerous, overly broad, unduly burdensome and not geared to obtain relevant information. Moreover, it amounts to harassment.

The Court will note that Defendants placed Plaintiff on notice as of its September 7, 2017 Discovery Responses that there was a dispute as to the scope of Plaintiff's Requests, and that Defendants were not in agreement with the Defendants.  A complete copy of both Cooper's and Beacon's Responses to Plaintiff's Discovery are found of record at Docket Entries 22 and 23, respectively.  Plaintiff took no issue with Defendants' responses until this motion.

Defendants submit that a Motion to Compel pursuant to Fed. R. Civ. Proc. 33 is a condition predicate to filing any Spoliation Motion under Fed. R. Civ. Proc. 37 (e).  The 1970 Notes of Advisory Committee on Rules is particularly instructive.  The Advisory Committee on Rules provided as follows:

 (3) If objections are made, the burden is on the interrogating party to move under Rule 37(a) for a court order compelling answers, in the course of which the court will pass on the objections. The change in the burden of going forward does not alter the existing obligation of an objecting party to justify his objections. E.g., *Pressley v. Boehlke,* 33 F.R.D. 316 (W.D.N.C. 1963). If the discovering party asserts than an answer is incomplete or evasive, again he may look to Rule 37(a) for relief, and he should add this assertion to his motion to overrule objections. There is no requirement that the parties consult informally concerning their differences, but the new procedure should encourage consultation, and the court may by local rule require it.

Defendants are not, and were not, bound by a Prelitigation Preservation Letters, nor were Defendants without ability to object to written discovery. Simply put, there is no prelitigation discovery in Kentucky absent agreement. Secondarily, Plaintiff did not seek a formal Preservation Order through this Court after filing suit.  Finally, Plaintiff did not take issue with Defendants' objections while discovery was ongoing through either a Motion to Compel or Motion to Determine the Sufficiency of Objections prior to the conclusion of discovery on April 2, 2018.  Thus, Plaintiff has waived this issue, because you cannot test objections by circuity after the close of discovery. This amounts to a waiver, and such action should be barred by laches..

**D.      CONTROL**

Subject to the arguments as to Plaintiff's Untimeliness and Waiver, it merits mention that in 2015, Rule 37(e) replaced the 2006 version of Rule 37(e). It authorized and specified measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures. The amendment of Rule 37 therefore foreclosed reliance on inherent authority or state law to determine when certain measures should be used.

The new version of Rule 37 also applies only to electronically stored information. It further applies only when such information is lost.  As in the case with Cooper's phone, and because electronically stored information often exists in multiple locations, loss from one source may often be harmless when substituted information can be found elsewhere.

In the first instance, a spoliation analysis is only appropriate where the lost information should have been preserved in the anticipation or conduct of litigation-- and the party failed to take reasonable steps to preserve it. The rule does not apply when information is lost before a

duty to preserve arises, as in the case with the purported loss of the dash cam video or Cooper's personal GPS.  As another example, and after the accident, Defendant Cooper operated the tractor and trailer and finished carrying the load of tires to its intended location.  As a result, the event data recorder in the truck was over written. Only parties "having control over the evidence" at issue have a duty to preserve. *Beaven,* supra, 622 F.3d at 553.

The first question, therefore, is what the Defendants actually controlled.  Underpinning the issue of "control" is that the evidence actually exists. Plaintiff basically attempts to 'assume into evidence' the existence of items that testimony from Cooper established did not exist.  For example, Cooper's testimony and others clearly establishes that there was no video taken at the scene by him.  The Court need only refer to portions of Cooper's deposition and others set out above to understand the basis for Defendants' position.  In opposite, it is acknowledged that Plaintiff relies on Saylor and Moore.  However, this testimony is not of record as of the Discovery Cut Off on April 2, 2018.  Moreover, Defendants have not been given any opportunity to cross examine Saylor and Moore, and Defendants incorporate herein their own Fed. R. Civ. Proc. 37 © Motion currently pending before this Court. It is Defendants' position that Saylor's and Moore's affidavits are inaccurate, especially as to Cooper's purported videography.

With respect to photographs and Cooper's cellular phone, Plaintiff was provided the photographs on Cooper's phone in discovery, and also was provided a copy of the Cooper phone download in Defendant's possession during discovery in this matter in February, 2018 (well before the Discovery Cut Off).  Plaintiff did not raise this issue with the Court after the parties conducted an informal conference in front of a court reporter.

### E.     DUTY TO PRESERVE

The next question is whether Defendants had a duty to preserve certain items in this case. Defendants dispute a duty to actually preserve Cooper's cell phone, Cooper's GPS and Cooper's dash cam.  Defendants worked with the Plaintiff prelitigation when Defendants had no obligation to do so.  After suit was filed, Defendant continued working in good faith in this matter and produced additional documentation through formal discovery subject to formal objections.

To get to the heart of this matter, and after the Defendants herein made an initial proffer of items and documents preserved in formal discovery, the duties shifted.  To wit: the Plaintiff had an obligation to respond, and at a minimum, request further documentation or information during discovery.  After Defendants responded via formal written discovery with objections, the issue becomes one of specificity which requires more than the filing of an untimely sanction's motion.  The duty falls on Plaintiff to make an issue of any purported failing during discovery.

It is interesting to note that the Defendants were not able to get any more beneficial information from Noble's phone when it was downloaded, which would tend to indicate there is not much to be gained in this case from either cell phone.  This also indicates a level playing field.  And, the Defendants utilized the same vendor that down loaded Cooper's cellular phone, Sword & Shield of Knoxville, Tennessee, when Defendants were given a copy of the Noble phone download.  And, both parties herein appear to be relying on the very same software program for analysis.

Defendants admittedly did not personally have the technical expertise to down load Cooper's phone.  So, Defendants retained a third-party as outlined, because it was beyond Defendants' technical expertise.  Nowhere within the Fed. Civ Rules does it specify a heightened quality and/or degree of preservation. When coupled with the lack of Plaintiff's attention to the

matter for over a year, Defendants are left to wonder how important this purported evidence really is to the Plaintiff, or if Plaintiff wants to make this an issue after the fact in hopes of curing issues with the Plaintiff's failure to disclose Saylor's and Moore's statements?

Plaintiff seemingly argues that because Defendants did not take Cooper's cell phone from him and store it in a zip lock bag, Defendants breached a duty to preserve.  Rather, Defendants downloaded the phone and preserved the download.  Then, Defendants turned over the download to Plaintiffs, and did not hear a peep, whisper or anything from Plaintiff for nearly a year.  The common Kentucky expression applicable is "crickets"—meaning that the gentle chirp of a cricket was the only sound heard, or no response.    To wit: why have an informal conference in front of a court reporter, and then not assert the matter formally, if there was actually any real breach of the duty to preserve?  It is Defendants' position that the bell sounded in the form of the Discovery Cut Off on April 2, 2018.  Otherwise, this Court would be placed in a position of discovery without end.  Hence, Defendants comparison of the Motion before this Court as Legal "Whac-A-Mole."

### F.    CULPABILITY

"To warrant a spoliation sanction, the party seeking the sanction must show that the evidence was destroyed with a culpable state of mind." *Adkins,* supra, 692 F.3d at 504.  "The culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." *Beaven,* supra, 622 F.3d at 554 (internal quotation marks, brackets, and emphasis omitted).  An accurate assessment of the defendant's state of mind "is important because the Court can impose different spoliation sanctions, calibrating severity of the remedy on the party's degree of fault under the circumstances." *In re Black Diamond Mining Co.*, 514 B.R. 230, 239 (Bankr. E.D. Ky. 2014).

Plaintiff attempts to argue that Defendants willfully destroyed evidence.  This simply is inaccurate.  In this case, there was a time-consuming effort by Defendants to secure and hold evidence that was reasonably known to exist right after the accident.  When Defendants received various requests from Plaintiff, Defendant responded appropriately and in good faith.  Over a couple hundred pages of documents were given to Plaintiff in prelitigation disclosures, which was not required by Kentucky law (and which is the epitome of making a good faith effort).  Moreover, Defendants responded to formal written discovery with the very same documents and formal written objections. Plaintiff did not make any formal grievance to this Court until nearly a year after the close of discovery. To be blunt, Defendants again deny that they destroyed any evidence.  And, the testimony timely in the record indicates, Defendants further advised Plaintiff in discovery of the preservation of additional documents.  Plaintiff did not properly pursue the issue as required.

If there was any oversight in the preservation and/or production of evidence, Defendants were truthful and made a good faith effort before suit (and during discovery) in this matter to produce relevant and requested information.  Defendants even permitted Plaintiff to come upon Defendants' terminal in LaVergne, Tennessee, and bring its experts to examine both the truck and tractor prior to litigation.  This extremely important, if not critical fact, demonstrates that Plaintiff every opportunity in its own right very early to obtain whatever Plaintiff wanted, and to obtain  it in the manner, Plaintiff wanted it.

It appears that Plaintiff's accident reconstructionist, Joey Stidham, has the capability to conduct electronic downloading, because he was the person which downloaded the Noble vehicle's EDR first.  Moreover, Jason Woods is accident reconstructionist, Joey Stidham's employee, and apparently Plaintiff's undisclosed cell phone expert.

While Defendant Cooper's phone was reset, it was accidental and without awareness of any consequences. When confronted by the Plaintiff over the issue, Defendant turned over a complete copy of Defendants' down load of Cooper's phone without hesitation. Defendnts worked with Plaintiff in "good faith' to remedy the issue by providing a copy of its download. The Court was never involved in this issue until now. As a result, there is no evidence that any Defendants acted with any culpability in violating Defendants' preservation duties.

On the other hand, Plaintiff is in actuality the culpable party if we want to get down to brass tacks. This Court has already found that Plaintiff has untimely disclosed Saylor's and Moore' statements and video, all the while sharing them with their chosen experts. Moreover, it is evident that the Plaintiff knew before the close of discovery of each and everyone one of its alleged spoliation issues and opted not to timely address any of the same. Rather, and when the Plaintiff's situation began to further deteriorate, drastic times required drastic measures. So, Plaintiff manufactured this entire dispute to buttress its already weak position.

### G.    RELEVANCE

Another important consideration is whether the allegedly spoliated evidence is relevant to Plaintiff's claims. "[T]he party seeking the adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Automated Solutions Corp. v. Paragon Data Sys., Inc.,* 756 F.3d 504, 514 (6th Cir. 2014).

Defendants will only address the relevance of Cooper's cell phone, since any other allegedly spoliated evidence is addressed elsewhere. Defendants' download of Cooper's cell phone was given to the Plaintiff. To argue that "your expert is better than mine," has little merit, but effectively Plaintiff wants this Court to engage in innuendo and speculation that Cooper's

phone might have generated more information in its expert's hands—although, everybody was using the same software program.  Moreover, allowing this issue to live on after discovery creates a trial within a trial over cell phone downloads.  Neither party disclosed and/or listed its cellphone expert as an expert.

In this case, Cooper was unequivocally not on his phone when this accident occurred. Moreover, both Plaintiff and Defendants have utilized accident reconstructionists and human factors experts to fully examine the accident in issue.  These experts presumably based their opinions on scientific principles and measurements such as distance traveled after impact.  In turn, this is routinely accepted in this area as a good way to determine the speed  of a vehicle before impact.  It is hard to imagine how a cell phone could add to physical evidence, if not in use at the time of the accident..

Similarly, Michael Anderson, an eye witness to the accident, has testified to the manner in which the accident occurred.  And, Plaintiff has never taken issue with the fact that Noble rear ended the Cooper, nor is there a dispute that Cooper's vehicle was slow moving.  In summary, Defendants dispute the relevance of Cooper's phone, since it was only in use after the accident had already occurred.

## H.    SANCTIONS REQUIRE "BAD FAITH."

Without waiving any of the foregoing arguments, there is no evidence that Defendants acted in bad faith.  Because there is no evidence that Defendants acted in bad faith, sanctions under Fed. R. Civ. Proc. 37 (e) should not apply.  Sanctions should apply only where there has been a scheme or artifice employed by a party. *Cf. Victor Stanley,* supra, 269 F.R.D. at 534 ("Courts may order a default judgment or dismissal to send a strong message to other litigants,

who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely sanctioned.").

No sanctions are warranted herein, because Plaintiff did not prove bad faith during discovery by and through any Motions to Compel, or by enforcement of the same.   Plaintiff's Motion also smacks of an attempt to argue punitive damages by circuity following Plaintiff's waiver of the same in response to Defendants' Motions for Summary Judgment on Plaintiffs' Punitive Claims. The exercise of objections by Defendants is not bad faith.   Objections are provided for in the Civil Rules.   Rather, ours is an adversarial system that places the burden of proof on the Plaintiff.  The Plaintiff's burden of proof included moving to compel in view of the various objections raised, or by acquiescence, the Plaintiff  waived the issues.  Thus, there can be no showing of bad faith in view of Defendants' objections, and Plaintiff failure to test the same during discovery.

Plaintiff's Motion for alleged spoliation requests "an adverse inference" against the Defendants.  An "adverse inference" is an inference that the party fears producing the evidence; and this fear is some evidence that the circumstances or document or witness, if brought, would have exposed facts unfavorable to the party." *Flagg v. City of Detroit,* 715 F.3d 165, 177 (6th Cir. 2013) (internal quotation marks and brackets omitted). "[A]n adverse inference is usually only permissive for the factfinder, not mandatory[.]"   *Beaven,* supra, 622 F.3d at 555. But whether "an adverse inference is permissive, or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault." *Flagg v. City of Detroit,* 715 F.3d 165, 177 (6th Cir. 2013)

If such an inference were allowed herein, this again creates the trial within the trial upon the relevance and application of Cooper's cellular phone with expert not properly and/or timely

disclosed.  It further reopens discovery in this matter as both experts' depositions would need to be taken.  Again, Defendants turned over a copy of the download of Cooper's phone during discovery, and Plaintiff did not address the issue timely.  No case Defendants found in the Sixth Circuit  sanctioned a party where the moving party did not raise the issue during discovery.  See, e.g., *Gilley v. Eli Lilly &Co.,* 2013 WL 1701066, *7-9 (issue raised in discovery and fact that defendant had access to printed copies of digital images that plaintiff destroyed militated in favor of permissive inference); *Flagg v. City of Detroit,* 2011 WL 4634245, *8 (E.D. Mich.) (issue raised in discovery and mandatory-inference instruction against defendant too harsh where plaintiffs "have been given a lengthy discovery period, and the Court has afforded them considerable latitude in exploring avenues of discovery," but plaintiffs failed to show missing documents were "especially fertile ground of relevant evidence"), aff'd, 715 F.3d 165 (6th Cir. 2013).

WHEREFORE, Defendants, Beacon Transport, LLC and Terran Cooper request that the Court deny Plaintiff's Motion for Sanction based on the arguments raised herein.

Respectfully submitted,

JUDD, SATTERFIELD & ASSOCIATES, PLLC
869 Broadway Avenue
P.O. Box 51093
Bowling Green, KY  42102
Telephone: (270) 904-4141
Facsimile:  (888) 590-2842

/s/Harlan E.  Judd, III
Harlan E. Judd, III

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and exact copy of the foregoing was emailed and/or sent by the Court's ECF system on the 15th day of February, 2019, addressed to the following:

Randall Jewell
Jewell Law Office, PLLC
P.O. Drawer 670
Barbourville, Kentucky 40906

Billy J. Taylor
Taylor Law Office, PLLC
110 Know Street, Suite A
Barbourville, Kentucky 40906

Timothy D. Lange
Benson Risch & Lange, PLLC
One Riverfront Plaza
Suite 2150
401. W. Main Street
Louisville, Kentucky 40202

/s/Harlan E.  Judd, III_____
Harlan E. Judd, III
Counsel for the Defendants